## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

SHERIF OSMAN
c/o Walden Macht & Haran LLP
250 Vesey Street, 27th Floor
New York, New York 10281

    Plaintiff,

   -against-

INTERNATIONAL CRIMINAL POLICE
ORGANIZATION
c/o United States National Center Bureau Interpol
600 E Street Northwest #600
Washington, DC 20004

THE ARAB INTERIOR MINISTERS COUNCIL
c/o Arab League
26VM+V8R, Ismailia, Qasr El Nil, Cairo
Governorate 4272081, Egypt

EGYPT
c/o Egypt Ministry of Foreign Affairs
2Q82+9GR, Cairo Governorate
Desert, Cairo Governorate
4851436, Egypt

ADBEL FATTAH EL-SISI
c/o Egypt Ministry of Foreign Affairs
2Q82+9GR, Cairo Governorate
Desert, Cairo Governorate
4851436, Egypt

UNITED ARAB EMIRATES
c/o United Arab Emirates Ministry Foreign Affairs
King Abdullah Bin Abdul Aziz Al Saud Street, Al
Bateen – Abu Dhabi – United Arab Emirates

AHMED NASSER AL-RAISI
c/o United States National Center Bureau Interpol
600 E Street Northwest #600
Washington, DC 20004

SAIF BIN ZAYED AL NAHYAN
c/o United Arab Emirates Ministry Foreign Affairs

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

King Abdullah Bin Abdul Aziz Al Saud Street, Al
Bateen – Abu Dhabi – United Arab Emirates

ISMAIL ALI MADANI
c/o Public Prosecution Dubai
7 – 7 Riyadh St. – Umm Hurair 2
Dubai – United Arab Emirates

JOHN DOES 1-4,

                                    Defendants.

---

"[H]ostage-taking and the wrongful detention of United States nationals abroad constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.  **I hereby declare a national emergency to deal with this threat**."

- Presidential Executive Order 14078 (July 19, 2022) (emphasis added)

"[INTERPOL has] become a tool in the hands of despots and crooks who seek to punish dissidents and political opponents in an effort to turn other countries' law enforcement against the rule of law.  Rooting out this sort of abuse should be the top priority going into the INTERPOL General Assembly.  These abuses make a mockery of Interpol and are threatening its continued existence. INTERPOL's constitution cites the Universal Declaration of Human Rights as the basis for police cooperation.  Importantly and significantly, Article 3 of [Interpol's Constitution] forbids INTERPOL from engaging in any activities of a political, military, religious or racial character."

- Hon. Roger F. Wicker, U.S. Senator (R, MO), Opening Remarks, Authoritarian Abuse of INTERPOL, Helsinki Commission, 117th Congress, First Session (November 17, 2021)

Plaintiff SHERIF OSMAN, by and through his undersigned counsel, for his Complaint, hereby alleges, based on knowledge as to his own conduct, and on information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.     Plaintiff Sherif Osman is a United States citizen.  He is also a former Egyptian army officer, a political commentator, and an outspoken critic of the Egyptian government, primarily on his YouTube channel @SherifOsmanClub.

2.     Since 2011, Plaintiff Osman has criticized the regime controlling Defendant Egypt, Defendant Abdel Fattah el-Sisi and members of his family (the "el-Sisi Regime"), as well as corruption and abuses within Defendant Egypt's government.

3.     Plaintiff Osman's constitutionally protected advocacy against the el-Sisi Regime led to his kidnapping and arbitrary detention while traveling to Defendant United Arab Emirates ("UAE") in November 2022.  The kidnapping and arbitrary detention was caused by Defendants Egypt, Abdel Fattah el-Sisi, UAE, Saif bin Zayed Al Nahyan, Ahmed Nasser Al-Raisi, International Criminal Police Organization ("Interpol"), Ismail Madani, a prosecutor in the UAE, and Arab Interior Ministers Council ("AIMC").  The Defendants planned to force Plaintiff's extradition to Egypt—an authoritarian government known for torturing and killing political dissidents.

4.     Plaintiff Osman was also a victim of the el-Sisi's Regime's U.S.-based spy network, which was approved by Defendants Egypt and el-Sisi.  Defendants all participated in the plot to kidnap and detain Plaintiff Osman.

5.     Defendants' actions were intended to specifically stop Plaintiff Osman's advocacy and to chill and terrorize other dissidents in the United States and elsewhere.

6.      In the period between August 30, 2022, and October 31, 2022, Plaintiff Osman posted a series of 31 videos on his YouTube channel calling for protests in Egypt during President Biden's visit to attend the 2022 United Nations Climate Change Conference ("COP27") (the "COP27 Video Series").  The COP27 Video Series received over 1.3 million total views and triggered a series of events that resulted in Plaintiff Osman's kidnapping and detention.

7.      Although Plaintiff Osman was accustomed to receiving threats of death and violence in response to his videos and anti-authoritarian commentary throughout the years, the number of threats he received online, which were orchestrated by Defendants Egypt and el-Sisi, grew exponentially in response to his COP27 Video Series.

8.      Just a few short days after Plaintiff Osman posted the last installment of the COP27 Video Series, he became a victim of an act of terrorism and transnational repression.

9.      Defendants Interpol and AIMC effected his kidnapping and prolonged unlawful detention through their issuance of abusive and baseless "Red Notices."  Red Notices are requests submitted by Defendants Interpol's and AIMC's member nations, such as Defendant Egypt, to locate and arrest wanted persons pending extradition or similar legal action.[1]

10.     Defendants Interpol and AIMC, whose purposes are ironically to serve national police and security agencies to reduce international crime, issued Red Notices to law enforcement in the UAE to locate and imprison Plaintiff Osman at Defendant Egypt's direction.  Defendants Egypt and el-Sisi, in collusion with Defendants UAE, Al Nahyan, Al-Raisi, Interpol, AIMC, and UAE law enforcement, including Defendant Madani, requested Plaintiff Osman's extradition,

---

[1]  *See View Red Notices*, Interpol, available at https://www.interpol.int/en/How-we-work/Notices/View-Red-Notices.

which endangered his life given Egypt's documented history of extraditing and torturing dissidents.

11.     Sadly, this is not the first time Defendants Interpol and AIMC have weaponized their authority to issue Red Notices as a tactic to further transnational repression, including at the behest of member countries.[2]  Transnational repression is the strategy through which authoritarian regimes control freedoms beyond their borders to protect their powers at home.[3]

12.     Authoritarian governments, such as Defendants Egypt and UAE, use complicit agents, such as Defendants Interpol and AIMC, to perpetuate transnational repression by terrorizing critics of those governments, including by murder, torture, extortion, hostage-taking, false imprisonment, asset seizure, and foreign-travel restrictions.[4]

13.     This complaint seeks declaratory, injunctive, and other relief from Defendants' illegal, wanton, and pernicious conduct, which literally reaches into to the United States and brings their international-repression campaign to our shores.  Defendants' actions violate U.S. law, international law, and, in the case of Defendant Interpol, its own Constitution, which is the very basis of its international standing and acceptance and the United States' participation as an Interpol member.

---

[2] *See Abuse of Interpol for Transnational Repression:  Assessing the FY22 NDAA's Provisions for Prevention*, The Heritage Foundation (Nov. 12, 2021), available at https://www.heritage.org/global-politics/commentary/abuse-interpol-transnational-repression-assessing-the-fy22-ndaas; *Understanding the Arab Interior Ministers' Council and its Role in Transnational Repression*, MENA Rights Group (Mar. 9, 2023), available at https://www.menarights.org/en/articles/aimc.

[3] *See In the Shadows of Authoritarianism, Egyptian and Saudi Transnational Repression in the U.S.*, The Freedom Initiative (2023), available at https://thefreedomi.org/wp-content/uploads/2023/04/Transnational-Repression-Report-Single-Pages.pdf.

[4] *See id.*

14.     The allegations in this Complaint are pled on information and belief throughout, except to the extent certain allegations are verified by Plaintiff Osman's affidavit ("Osman Aff."), *see* Exhibit 1, or other noted citations.

## THE PARTIES

15.     **Plaintiff Sherif Osman** is a United States citizen and former Egyptian army officer who has lived in the United States since 2004.  In response to his anti-Egypt public rhetoric, in 2022, at Defendants Egypt's and el-Sisi's direction, Defendants Interpol and AIMC issued Red Notices that caused the kidnapping, imprisonment, and prosecution of Plaintiff Osman by Defendants UAE, Al Nahyan, Madani, and John Does 1-4.

16.     **Defendant Interpol** is an organization headquartered in Lyon, France that provides services for national police and security agencies to cooperate in the enforcement of their national criminal laws.  Defendants UAE and Egypt are member nations of Defendant Interpol.  The United States Attorney General maintains membership in Defendant Interpol on behalf of the United States and is authorized to designate departments and agencies to participate in the U.S. representation within the organization.[5]  The United States National Central Bureau, the entity through which the U.S. Attorney General functions in Defendant Interpol, is located in the United States in Washington D.C.  Defendant Interpol knows that some of its Red Notices are issued against citizens of the United States.

17.     **Defendant AIMC** is an institution of the Arab League, which is an entity comprised of member nation states from the Middle East.  Defendants Egypt and the UAE are both members of Defendant AIMC.  Defendant AIMC has established offices in five member states, including Defendant Egypt, and, on or around March 2023, Defendant UAE sent a delegation, led

---

[5] *See* 22 U.S.C. § 263a.

by Defendant Al Nahyan, to the 40th session of the council.[6]  Defendant AIMC enables the cooperation of Arab countries in national security and criminal enforcement, including by facilitating the apprehension and extradition of wanted individuals who are suspected of committing offenses through the diffusion of its arrest warrants and Red Notices.  Defendant AIMC knows that some of its Red Notices are issued against citizens of the United States.

18.     **Defendant Egypt**, or the Arab Republic of Egypt, is a transcontinental nation with an embassy located in the United States.  Defendant Egypt sought Plaintiff Osman's extradition to punish him for political dissent, with the ultimate goal of detaining and torturing Plaintiff Osman to terrorize and silence other political dissidents around the world, including in the United States. To facilitate Plaintiff Osman's extradition, Defendant Egypt requested a Red Notice from Defendants Interpol and AIMC, and caused Plaintiff Osman's arbitrary detention in Defendant UAE.

19.     **Defendant Abdel Fattah Saeed Khalil el-Sisi** is an Egyptian politician and retired military officer, who currently serves as President of Defendant Egypt.  Defendant el-Sisi is sued in his personal capacity.

20.     **Defendant UAE** is a nation comprising a federation of seven emirates, with an embassy in the United States.  Defendant UAE caused Plaintiff Osman to be arbitrarily detained by providing personnel and facilities to do so.  As an authoritarian nation, Defendant UAE's goal was to punish Plaintiff Osman for his political dissent, with the ultimate goal of extraditing him to

---

[6] *Saif bin Zayed heads UAE delegation to 40th session of Council of Arab Ministers Interior*, Federation of Arab News Agencies (Mar. 1, 2023), available at https://www.fananews.com/en/saif-bin-zayed-heads-uae-delegation-to-40th-session-of-council-of-arab-ministers-of-interior/.

Egypt for punishment and torture to terrorize and silence other political dissidents around the world, including in the United States.

21.     **Defendant Saif bin Zayed Al Nahyan** is Defendant UAE's Deputy Prime Minister and Minister of Interior.  Al Nahyan is sued in his personal capacity.

22.     **Defendant Ahmed Naser Al-Raisi** was elected as President of Defendant Interpol on November 25, 2021.  Al-Raisi is a UAE Interior Ministry official who has been accused of human rights violations, such as torture, while in office.  Al-Raisi is sued in his personal capacity.

23.     **Defendant Ismail Ali Madani** is a public prosecutor for Dubai's prosecution office.  He serves as the Dubai Central Jail's Interpol Liaison and oversaw the case against Plaintiff Osman.  Defendant Madani and his office utilize social media accounts of U.S.-based companies Twitter, LinkedIn, and Facebook.

24.     **Defendants John Doe 1 and John Doe 2** are Egyptian Intelligence Officers, who were assigned to surveil Plaintiff Osman's social media postings and coordinate with Egypt's U.S.-based spies to track Plaintiff's whereabouts.

25.     **Defendants John Doe 3 and John Doe 4** are UAE-based police officers who carried out the kidnapping of Plaintiff Osman from a restaurant in Dubai on November 6, 2022.

26.     Defendants Interpol and AIMC have a "Memorandum of Understanding," dated on September 22, 1999, which explicitly references the Interpol Constitution as well as the mutual intention to carry out coordination "within the limits of the laws existing in the different countries and **in the spirit of the Universal Declaration of Human Rights**."[7]  The Agreement emphasizes

---

[7] *Repository of Practice: Application of Article 3 of INTERPOL's Constitution in the context of the processing of information via INTERPOL's channels,* Interpol (Feb. 2013), available at https://www.interpol.int/content/download/12626/file/article-3-ENG-february-2013.pdf, at page 6 (emphasis added).

"the role of the police authorities in maintaining law and order **with due respect for human rights**."   In this context, the entities agreed to "mutual consultation and co-ordination" and "exchange of information."[8]   Defendant AIMC, in turn, "facilitate[s] regional co-operation" for "the issuance of arrest warrants and extradition of individuals who are suspected of committing offences."[9]

27.    Importantly, Article 3 of Interpol's Constitution provides as follows:  "It is strictly forbidden for the Organization to undertake any intervention or activities of a political, military, religious or racial character."   The primary purpose of this provision is to prevent Interpol from being used as a tool for persecution.[10]

## JURISDICTION AND VENUE

28.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under the federal Anti-Terrorism Act, 18 U.S.C. § 2333.  This Court has jurisdiction over Defendants Egypt and UAE under 28 U.S.C. § 1605A(a)(1).[11]

---

[8] *Id.* (emphasis added).

[9] *Tiger Team for Criminal Matters:  Powers of the Arab Interior Ministers Council*, Al Tamimi & Co., available at  https://www.tamimi.com/law-update-articles/tiger-team-for-criminal-matters-powers-of-the-arab-interior-ministers-council/.

[10] *Repository of Practice: Application of Article 3 of INTERPOL's Constitution in the context of the processing of information via INTERPOL's channels,* Interpol (Feb. 2013), available at https://www.interpol.int/content/download/12626/file/article-3-ENG-february-2013.pdf, at page 6.

[11] Section 1605A(a)(1) provides that a foreign state is not immune from jurisdiction of United States Courts  "in any case . . . in which money damages are sought against a foreign state for personal injury . . . that was caused by . . . hostage taking, or the provision of material support or resources for such an act[.]"  *See* 28 U.S.C. § 1605A(a)(1).  Defendants Egypt and UAE caused Plaintiff Osman personal injury by taking him hostage or providing material support for taking Plaintiff Osman hostage.  Because Egypt and UAE have not been designated as state sponsors of terrorism by the Attorney General, this case raises a question of first impression in this Circuit: whether foreign states not yet designated as state-sponsors of terrorism lose immunity from suit under § 1605A(a)(1).  Although district court opinions in this Circuit state, in dicta, that only

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(2).  *See Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005).

### FACTUAL ALLEGATIONS

### A.  Transnational Repression is a Form of Terrorism.

### a.  Legal Definitions

30.     Transnational repression occurs when an authoritarian government reaches across its borders to silence dissent, suppress speech globally, and export terror.

31.     Perpetrators of transnational repression employ wide-ranging physical and psychological tactics to maximize the effect of terror and silence their critics—from unlawful surveillance, threats, and wrongful detention to acts of extreme violence; many accounts of transnational repression include extrajudicial killings, physical assaults, and torture.  In all instances, the goal of transnational repression is to intimidate and chill political and social dissenters from voicing criticism or otherwise exercising their fundamental civil and human rights.

32.     Because transnational repression often ends in torture or murder, acts such as kidnapping, unlawful detention, and unexplained disappearances trigger extreme fear both in victims of those acts and in their friends, family, and others aware of the acts.

33.     "International terrorism" encompasses activities that involve acts "dangerous to human life" that violate United States criminal laws or would violate United States criminal laws

---

state-sponsors of terrorism are covered by § 1605A(a)(1)—despite Congress' decision not to make that a requirement of the provision, *see, e.g.*, *Lee v. Islamic Republic of Iran*, -- F. Supp. 3d --, 2023 WL 1100711, at *27 (D.D.C. Jan. 30, 2023)—Plaintiff has identified only one circuit, the Second, which has held that application of § 1605A generally requires that the state is designated as a state sponsor of terrorism. *Carpenter v. Republic of Chile*, 610 F.3d 776, 779 (2d Cir. 2010).

if they occurred in the United States. *See* 18 U.S.C. § 2331(1)(A). Acts of transnational repression are, indeed, "dangerous to human life," as they involve intimidation tactics—often in the form of physical detention and violence—which are violations of United States criminal law.

### b. Increasing Peril

34. Transnational repression, including arbitrary detentions, has become an increasingly prevalent practice by authoritarian governments over the past several years, and the number of violative acts is continuing to grow. The uptick in instances of transnational repression has received international attention; the Council of Europe has found that it is a "growing threat to the rule of law and human rights."[12]

35. Freedom House, a human rights research organization, has reported at least 854 physical incidents of transnational repression by 38 governments in 91 countries since 2014.[13] The organization reported that "[m]ore governments are committing more acts of transnational repression around the world," and that, in 2022 alone, 20 governments committed nearly 80 incidents of physical transnational repression.[14] The organization cited Defendant Egypt as one of the most prolific perpetrators of transnational repression.[15]

---

[12] *Transnational Repression As a Growing Threat to the Rule of Law and Human Rights*, Council of Europe, Parliamentary Assembly (2023), available at https://rm.coe.int/transnational-repression-as-a-growing-threat-to-the-rule-of-law-and-hu/1680ab5b07.

[13] *More Governments Engaged in More Transnational Repression During 2022*, Freedom House (Apr. 6, 2023), available at https://freedomhouse.org/article/new-report-more-governments-engaged-more-transnational-repression-during-2022.

[14] *Id.*; *see also* Y. Gorokhovskaia et al., *Still Not Safe: Transnational Repression in 2022*, Freedom House (2023), available at https://freedomhouse.org/sites/default/files/2023-04/FH_TransnationalRepression2023_0.pdf

[15] *Id.*

36.     Perpetrators of transnational repression target not only political dissidents themselves, but also their family members and acquaintances.[16]  Authoritarian governments use this tactic to exercise leverage over political dissidents to ultimately identify, punish, and silence those dissidents, and to terrorize other dissidents, advocates, and human rights lawyers.[17]  This practice has occurred, for example, where the activist is located in the United States while his or her family members are more easily reachable abroad.  In one instance, in September 2019, Egyptian authorities detained Hazem Ghonim, the brother of U.S.-based activist Wael Ghonim, after Wael refused to cease his public anti-Egypt advocacy.[18]

37.     Transnational repression attacks, or attempts thereof, have also increased in the United States in recent years.[19]  In July 2022, a man with a loaded AK-47 was arrested in Brooklyn, New York outside the home of Iranian-American journalist Masih Alinejad, an outspoken critic of the Iranian government.[20]  A year earlier, in July 2021, federal prosecutors announced kidnapping conspiracy charges against Iranian intelligence agents after uncovering a scheme to kidnap and

---

[16] *See* Fiona B. Adamson et al., *At Home and Abroad:  Coercion-by-Proxy as a Tool of Transnational Repression*, Freedom House (2020), available at https://freedomhouse.org/report/special-report/2020/home-and-abroad-coercion-proxy-tool-transnational-repression.

[17] *See id.*

[18] *Egypt Activist Wael Ghonim's Brother Ordered to Remain in Custody*, Aljazeera (Sept. 22, 2019), available at https://www.aljazeera.com/news/2019/9/22/egypt-activist-wael-ghonims-brother-ordered-to-remain-in-custody.

[19] Jason P. Hipp et al., *Transnational Repression Increasingly Reaches Into the United States*, Just Security (Apr. 5, 2023), available at https://www.justsecurity.org/85785/transnational-repression-increasingly-reaches-into-the-united-states/.

[20] Benjamin Weiser, *Man With Loaded Assault Rifle Arrested Outside Iranian Writer's Home*, New York Times (July 31, 2022), available at https://www.nytimes.com/2022/07/31/nyregion/iran-masih-alinejad-rifle-arrest.html.

forcibly return Alinejad to Iran.[21]  In August 2022, Salman Rushdie, another critic of the Iranian

government, was stabbed in the neck and abdomen while attending a conference in western New

York.[22]  Thus, political dissidents are facing increased danger even in the United States.

38.    In light of the growing dangers of transnational repression, on July 22, 2022,

President Joseph Biden issued an Executive Order declaring a national emergency to address the

threat of hostage-taking and wrongful detention of United States nationals abroad.[23]

### B. International Law on Transnational Repression and Arbitrary Detention, and Defendant Interpol's Binding Guidance[24]

39.    International law consistently and uniformly prohibits transnational repression in

all its malign forms as a fundamental violation of human rights.

40.    Article 9 of the United Nations International Bill of Human Rights' Universal

Declaration of Human Rights prohibits arbitrary arrest and detention since as early as 1948.[25]  The

Declaration, which has served as a roadmap for international human rights law, protects all persons

from, among other things, discrimination, torture, and inhumane treatment,[26] and recognizes a

---

[21] Deanna Paul, *Iranian Intelligence Plotted to Kidnap U.S.-Based Activist, Prosecutors Say*, The Wall Street Journal (July 14, 2021), available at https://www.wsj.com/articles/iranian-intelligence-plotted-to-kidnap-u-s-based-activist-prosecutors-say-11626225550. .

[22] Jay Root et al., *Salman Rushdie is Attacked Onstage in Western New York*, New York Times (Aug. 12, 2022), available at https://www.nytimes.com/2022/08/12/nyregion/salman-rushdie-attacked.html.

[23] Exec. Order No. 14078, 87 F.R. § 43389 (2022).

[24] This complaint raises another issue of first impression:  Does Article 3 of the Interpol Constitution, Interpol's published guidance on its policies for enforcement of Article 3's prohibitions, the extensive international law on which it is based, and the numerous international contracts that provide the system to enforce it, give rise to an individual's cause of action when it is violated.

[25] United Nations, *Universal Declaration of Human Rights*, available at https://www.un.org/en/about-us/universal-declaration-of-human-rights.

[26] *Id.,* at Art. 2 and 5.

global right "to leave any country, including his own, and to return to his country."[27]  This milestone

document has 192 signatories, including the United States, Egypt, and the UAE.

41.     International law groups have made more recent strides to combat the uptick in

transnational repressive acts as well.  For example, in December 2006, the United Nations General

Assembly adopted the International Convention for the Protection of All Persons from Enforced

Disappearance, which, among other things, obliges participating states to criminalize enforced

disappearances, investigate persons' disappearances, and provide victims with access to justice

and reparations.[28] The convention was ratified in December 2010 with 98 signatories.[29]

42.     On March 30, 2023, seven democratic governments, including the United States,

endorsed a declaration pledging to combat transnational repression by, among other steps,

increasing awareness of the threat by educating border enforcement, immigration, cybersecurity,

and law enforcement; assisting victims as needed; increasing outreach to potential targets to inform

them of their rights and reporting procedures; and increasing accountability for perpetrators of

transnational repression through sanctioning measures and other diplomatic consequences.[30]

---

[27] *Id.,* at Art. 13.

[28] *Background to the International Convention for the Protection of all Persons from Enforced Disappearance*, United Nations Human Rights Office of the High Commissioner, available at https://www.ohchr.org/en/treaty-bodies/ced/background-international-convention-protection-all-persons-enforced-disappearance.

[29] *International Convention for the Protection of All Persons From Enforced Disappearance*, United Nations Treaty Collection, available at https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-16&chapter=4&clang=_en.

[30] *Summit for Democracy: Six Countries Join United States in Pledging to Strengthen the Fight Against Transnational Repression*, Freedom House, available at https://freedomhouse.org/article/summit-democracy-six-countries-join-united-states-pledging-strengthen-fight-against.

43.     Even more recently, on May 23, 2023, the Council of Europe's Parliamentary Assembly's Committee on Legal Affairs and Human Rights unanimously adopted a resolution condemning acts of transnational repression and recommending its Committee of Ministers to review and update its guidelines and consider drafting a recommendation to its member states to combat transnational repression.[31]   The Committee comprises dozens of members from the Council's 46 member states.

44.     Based on these same concerns, Defendant Interpol claims to take a strict view of allegedly "illegal speech" directed at a state, state officials, or state institutions.  Even in its official guidance, it has stated that, in evaluating member requests for Red Notices, any case alleging "[the] expression of certain prohibited opinions" or words that are "insulting [to] the authorities" falls within the prohibition of Article 3 "by their very nature."[32]

45.     Moreover, in close cases, Defendant Interpol claims "each request [for a Red Notice] that raises a doubt concerning its conformity with Article 3 will require an assessment on a case-by-case basis. Such review should focus, in particular, on the underlying facts supporting the request."[33]

46.     Defendant Interpol's own guidance highlights the need for a careful evaluation of Red Notice requests, including by requesting information from the requesting state and other states with relevant information:  "The need to evaluate all relevant information and pertinent elements, as provided by the rules, represents a comprehensive interpretative approach. Moreover, this

---

[31] *Transnational Repression As a Growing Threat to the Rule of Law and Human Rights*, Council of Europe, Parliamentary Assembly, available at https://rm.coe.int/transnational-repression-as-a-growing-threat-to-the-rule-of-law-and-hu/1680ab5b07.

[32] https://www.interpol.int/content/download/12626/file/article-3-ENG-february-2013.pdf,  page 14.

[33] *Id.*, at page 8.

approach provides for – indeed requires – the examination and consideration of pertinent facts beyond those explicitly supplied in the request for police cooperation, such as information concerning the background for the request or how it relates to other requests. Thus, for example, it might be relevant to assess a red notice request together with similar requests concerning other individuals wanted by the same country, or to consider the fact that those similar requests have been denied in the past."[34]

### C.  The el-Sisi Regime's Transnational Repression Campaign

47.     In July 2013, as Egypt's army chief, Defendant el-Sisi led a military coup to remove then-President Mohamed Morsy from power.  In June 2014, after a controversial election during which Defendant el-Sisi's campaign allegedly attacked and detained campaign representatives for his opponents and intimidated his opponents' supporters, Defendant el-Sisi was elected President.

48.     Thereafter, the el-Sisi Regime mounted a campaign of terror against dissenting voices, including by taking tens of thousands of citizens as political prisoners, arresting journalists and human right lawyers, torturing detainees, fabricating charges and evidence against critics, and imposing travel bans and asset freezes.  The Egyptian Commission for Rights and Freedoms documented 912 victims of forced disappearance, 52 of which had not been heard from by the time the Commission issued its report, between 2015 and 2016 alone.[35]  Human rights groups have estimated that el-Sisi's Regime has charged or arrested at least 60,000 critics and protesters since

---

[34] *Id.*, at page 8.

[35] *Egypt:  Consolidating Repression Under al-Sisi*, Human Rights Watch (Jan. 12, 2017, 10:00 AM), https://www.hrw.org/news/2017/01/12/egypt-consolidating-repression-under-al-sisi.

2013.[36]  The Nadeem Center for the Rehabilitation of Victims of Violence and Torture identified

433 cases of torture by the Egyptian police in a ten-month period in 2017 alone.[37]

49.     The el-Sisi Regime also shuttered many prominent human rights groups, including

the Arabic Network for Human Rights Information, which cited threats, violent attacks, and arrests

as reasons for its closing.[38]  The only group that seemed to remain out of reach was the Egyptian

ex-patriot community, increasingly dominated by critics of the regime.[39]  But the el-Sisi Regime

developed a plan to address that gap.

50.     The plan to target critics abroad had two central components, one indirect and one

direct.  Defendant el-Sisi has used his government, as well as other corrupt nation states (such as

Defendant UAE) and organizations (such as Defendants Interpol and AIMC) to execute his plan

of international terrorism.

51.     As a means of applying **indirect pressure**, the el-Sisi Regime has arrested, imposed

travel bans on, or imposed asset freezes against many relatives of its ex-patriot critics.  For

example, six of those detained and/or tortured are relatives of Mohamed Soltan, the founder of The

---

[36] *See Egypt:  Torture Epidemic May Be Crime Against Humanity*, Human Rights Watch (Sept. 6, 2017), https://www.hrw.org/news/2017/09/06/egypt-torture-epidemic-may-be-crime-against-humanity; *Egyptian Activist's Arrest Sparks Safety Fears in Lebanon*, Aljazeera (May 28, 2023), https://www.aljazeera.com/news/2023/5/28/egyptian-activists-arrest-sparks-safety-fears-in-lebanon.

[37] *Egypt:  Consolidating Repression Under al-Sisi*, Human Rights Watch (Jan. 12, 2017, 10:00 AM), https://www.hrw.org/news/2017/01/12/egypt-consolidating-repression-under-al-sisi.

[38] *Egypt:  Leading Rights Group Closes Citing Government Persecution*, Aljazeera (Jan. 10, 2022), https://www.aljazeera.com/news/2022/1/10/egypt-leading-rights-group-closes-citing-government-persecution; *Egypt:  Prominent Rights Group Forced to Close*, Human Rights Watch (Jan. 12, 2022, 9:45 AM), https://www.hrw.org/news/2022/01/12/egypt-prominent-rights-group-forced-close.

[39] Khalil Al-Anani, *Sisi's Transnational Repression:  Silencing Political Dissidents in Exile*, Arab Center Washington DC (Jan. 26, 2022), https://arabcenterdc.org/resource/sisis-transnational-repression-silencing-political-dissidents-in-exile/..

Freedom Initiative.[40]   The reprisals are based solely on Soltan's U.S.-based advocacy for democratic principles and against the el-Sisi Regime, including through his Twitter account. According to an article published by Human Rights Watch, "[t]he Egyptian families of dissidents abroad have been increasingly caught in President al-Sisi's government web of oppression."[41] The el-Sisi regime took similar actions against family members of other prominent critics in the United States, including (a) raiding the home of Aly Hussein Mahdy, a graduate student that the University of Chicago after he posted a critical Facebook video on February 11, 2022,[42] and (b) arresting nine family members of Sherif Mansour, the Program Coordinator of the Washington D.C.-based Committee to Protect Journalists, and forcibly disappearing his cousin.[43]   The el-Sisi Regime has taken similar actions against dissidents located in Germany, the United Kingdom, and Turkey.[44]

52.      As a means of applying **direct pressure**, the el-Sisi Regime sent spies to the United States and other democracies to chill, intimidate, and surveil its critics.  One of those spies, Pierre Girgis, has been arrested and charged for acting as an agent of a foreign government (Defendant Egypt) by, among other things, "track[ing] and obtain[ing] information regarding political

---

[40] The Freedom Initiative is a non-profit organization dedicated to advocating for wrongfully detained prisoners in, among other regions, the Middle East.  *See Our Mission*, The Freedom Initiative, https://thefreedomi.org/our_mission/.

[41] *Egypt:  Escalating Reprisals, Arrests of Critics' Families*, Human Rights Watch (Feb. 19, 2021, 12:00 AM), https://www.hrw.org/news/2021/02/19/egypt-escalating-reprisals-arrests-critics-families (quoting Joe Stork, deputy Middle East and North Africa director at Human Rights Watch).

[42] https://www.facebook.com/alyhmahdy/videos/288834225997797/.

[43] Human Rights Watch, *supra* note 41; *see also CPJ Condemns Egyptian Authorities' Judicial Harassment of Sherif Mansour, Family*, Committee to Protect Journalists (Feb. 25, 2021, 12:40 PM), https://cpj.org/2021/02/cpj-condemns-egyptian-authorities-judicial-harassment-of-sherif-mansour-family/. .

[44] Human Rights Watch, *supra* note 41.

opponents of" the el-Sisi Regime. *See United States v. Girgis*, No. 22-CR-00006 (S.D.N.Y.). Girgis was arrested after a lengthy investigation that revealed Defendant Egypt's effort to cultivate a large network on U.S.-based spies and proxies.[45] Another such spy, Amin K., was arrested by German authorities for similar activities while working in then-Chancellor Angela Merkel's Federal Press Office.[46]

53.     Some of these foreign agents have directly confronted and assaulted critics in the United States. For example, at an Egypt advocacy event in Washington, D.C., in March 2019—which was hosted by Freedom Initiative, Human Rights Watch, and the Project of Middle East Democracy—Egyptian agents confronted and repeatedly assaulted Mohamed Soltan.[47] Multiple U.S.-based Egyptian activists have reported being stalked, intimidated, or recorded while attending or presenting at conferences and meetings in various U.S. cities.[48] U.S.-based Egyptian dissidents have also reported receiving death threats and experienced the Egyptian embassy denying them consular services.[49] In one instance, a dissident's associate and co-organizer of pro-democracy groups and initiatives threatened the dissident by saying "[el-Sisi] says go with [the] flow or you'll

---

[45] *See United States v. Girgis*, 22-CR-00006, ECF No. 36 (S.D.N.Y. Apr. 27, 2023) (KPF).

[46] *Germany Charges Egyptian With Spying*, Deutsche Welle (Nov. 16, 2020), https://www.dw.com/en/germany-charges-egyptian-with-spying-while-working-in-merkels-press-office/a-55618075.

[47] As part of the el-Sisi Regime's pattern of transnational repression, it arrested Soltan in Egypt and sentenced him to prison for life based on his advocacy for democracy in Egypt. The U.S. secured his release in 2015, purportedly by signing a document promising Soltan would serve out his sentence in a U.S. jail, an agreement the United States later refused to honor. https://www.politico.com/news/2021/07/12/egypt-spy-boss-jail-american-498983. The purported agreement is available at: https://www.politico.com/f/?id=0000017a-8cd1-d27f-a3fa-edd7f54a0000.

[48] *See In the Shadows of Authoritarianism*, The Freedom Initiative (2023), available at https://thefreedomi.org/wp-content/uploads/2023/04/Transnational-Repression-Report-Single-Pages.pdf.

[49] *Id.* at 33.

drown."[50]  Aly Mahdy, an Illinois-based dissident who facilitated the publication of a video that captured torture occurring in an Egyptian police station, was added to Defendant Egypt's national terrorist list, tried for terrorism-related crimes, and sentenced to life in prison in absentia, preventing him from returning to his home country safely.[51]

54.     The el-Sisi Regime's continued adherence to its campaign of transnational repression has been widely documented and even the subject of congressional censure, as the el-Sisi Regime refuses to relent even after the United States threatened to withhold security aid and military equipment in light of its severe human rights abuses.  The bipartisan co-chairs of U.S. Congress's Egypt Human Rights Caucus released a statement on January 25, 2022, declaring:

> It is reasonable to expect a government that depends on the United States for security assistance to show some respect for repeatedly expressed U.S. concerns.  Instead, the government of Egypt has continued to engage in widespread torture, suppression of dissent, and even persecution of American citizens and the families of critics living in the United States, while treating our military aid as an entitlement that must be provided unconditionally.  Holding firm on the conditions would be consistent with President Biden's campaign commitment of "[n]o more blank checks" for the Egyptian military regime.[52]

55.     Defendant Egypt has long been accused of torturing political dissidents.  In a 2017 report, the United Nations Committee Against Torture reached an "inescapable conclusion that

---

[50] *Id.*

[51] *Id.*

[52] *Statement of Egypt Human Rights Caucus on the Egyptian Government's Pending Deadline to Comply With Human Rights Conditions on US Taxpayer Gifted Weapons*, Congressman Don Beyer Press Releases (Jan. 25, 2022), available at https://beyer.house.gov/news/documentsingle.aspx?DocumentID=5432.

torture is a systematic practice in Egypt," which occurs "particularly frequently following arbitrary arrests."[53]

56.     Since 2019, officials have used torture to thwart protests, including public abuses against some of the country's most prominent political activists,[54] and, in March 2023, the United Nations Human Rights Committee expressed concern about the commission of human rights violations against Egyptian political opponents.[55]

57.     In recent years, Egyptian authorities have refused to renew passports and identification cards or provide birth certificates to dissidents abroad, pressuring them to return to near-certain persecution in Egypt.[56]  Dissidents have also been unlawfully deported to Defendant Egypt from several countries, despite known and serious risks of torture and abuse for their past political activities.[57]  At least one Egyptian deported from Turkey and five deported from Malaysia

---

[53] *2017 Annual Report*, United Nations Committee Against Torture (June 2017), available at http://docstore.ohchr.org/SelfServices/FilesHandler.ashx?enc=dtYoAzPhJ4NMy4Lu1TOebJtO zHl9Ya%2bxza%2bE%2bvtPfEMjvoay0x2iV30x2zj4TLGEMjRXVex9Q%2fNhnR3%2fZHIw w27bw4ZF3htxFLucJ9b7NxE%3d; *see also Egypt:  Set Independent Torture Inquiry*, Human Rights Watch (Feb. 14, 2019), available at https://www.hrw.org/news/2019/02/14/egypt-set-independent-torture-inquiry.

[54] *See, e.g.*, Jared Malsin, *Egypt Accused of Using Torture to Thwart Protests*, The Wall Street Journal (Oct. 26, 2019), available at https://www.wsj.com/articles/egypt-accused-of-using-torture-to-thwart-protests-11572084002.  In one reported instance, a student was arrested, beaten, and chained to a wall for a week after officers searched his phone in the street in downtown Cairo and found a photo of a protest that he sent to a friend.  *Id.*

[55] *UN Human Rights Committee publishes findings on Egypt, Panama, Peru, Sri Lanka, Turkmenistan and Zambia*, United Nations Human Rights Office of the High Commissioner (Mar. 24, 2023), available at https://www.ohchr.org/en/press-releases/2023/03/un-human-rights-committee-publishes-findings-egypt-panama-peru-sri-lanka.

[56] *Egypt: Dissidents Abroad Denied Identity Documents*, Human Rights Watch (Mar. 13, 2023), available at https://www.hrw.org/news/2023/03/13/egypt-dissidents-abroad-denied-identity-documents.

[57] *See, e.g.*, Human Rights Watch, *Egypt: Deported Dissidents Missing* (Apr. 4, 2019), available at https://www.hrw.org/news/2019/04/04/egypt-deported-dissidents-missing.

were reported missing after arriving in Defendant Egypt; the individual deported from Turkey was allegedly seen weeks later with signs of being severely tortured.[58] Kuwait authorities have similarly unlawfully returned Egyptian dissidents.[59]

### D. Defendant Interpol's Role in Transnational Repression

58.     Defendant Interpol has engaged in acts of transnational repression on behalf of malign states, including Defendant Egypt. Defendant Interpol has effectuated kidnappings and unlawful detentions with authoritarian regimes by abusing their systems. Defendant Interpol has done so in flagrant disregard of its own Constitution.

### a. Defendant Interpol Generally

59.     Defendant Interpol is an international policing organization that can issue and circulate alerts around the globe on behalf of member countries for suspected criminals, for the purpose of seeking extradition. These alerts are known as Red Notices.

60.     Defendant Interpol's Constitution requires that all of Defendant Interpol's practices—including Defendant Interpol's issuance of Red Notices—comply with the spirit of the Universal Declaration of Human Rights and be politically neutral.[60]

---

[58] *Kuwait: 8 Egyptian Dissidents Unlawfully Returned*, Human Rights Watch (Jul. 15, 2019), available at https://www.hrw.org/news/2019/07/15/kuwait-8-egyptian-dissidents-unlawfully-returned.

[59] *Egypt: Torture of activist Alaa Abdel Fatah illustrates use of extreme brutality to crush dissent*, Human Rights Watch (Oct. 10, 2019), available at https://www.amnesty.org/en/latest/press-release/2019/10/egypt-torture-of-activist-alaa-abdel-fattah-illustrates-use-of-extreme-brutality-to-crush-dissent/.

[60] *See* Interpol Constitution Art. 2 and 3.

61.    Indeed, Defendant Interpol's Constitution "strictly forbids" Defendant Interpol from "undertak[ing] any intervention or activities of a political, military, religious or racial character."[61]

62.    In 1938, Congress authorized the U.S. Attorney General to "accept and maintain" membership in Interpol with 22 U.S.C. § 263a.

63.    Congress also authorized federal funding which enabled the Department of Justice ("DOJ") and the Department of Homeland Security ("DOH") to participate in international agencies, such as Interpol, with 28 U.S.C. § 530C.

64.    Pursuant to that authority, the Department of Justice ("DOJ") and the Department of Homeland Security ("DOH") have entered into various Memoranda of Understanding ("MOU") concerning U.S. membership in Defendant Interpol, which make specific reference to the Interpol Constitution, as recently as July 19, 2010.[62]

65.    These MOUs provide for various roles for the United States within Defendant Interpol.  Three primary roles are relevant.  First, again referencing the Interpol Constitution, the MOUs establish a central U.S.-based office for Defendant Interpol: the United States National Central Bureau ("USNCB").  The MOUs make specific commitments concerning the process through which Directors of the USNCB will be selected.  Second, the MOUs establish an "Executive Management Committee" of the USNCB, which consists of the Deputy Attorney General, the DHS Secretary, and the Director of the USNCB.  Third, again referencing the Interpol Constitution, the MOUs provide for a process for selecting candidates from the USNCB on the

---

[61] *See* Interpol Constitution Art. 3.

[62]     *See,*      *e.g.*,      https://www.justice.gov/sites/default/files/interpol-washington/legacy/2012/04/30/doj-dhs-mou-addendum-usncb-signed-7-19-10.pdf.

Interpol Executive Committee, which is "Interpol's senior select deliberative body for program and policy decisions."

66.     As the cornerstone of Defendant Interpol's Constitution, Article 3 is a key provision in Justice Department policy concerning the handling of Interpol-USNCB requests for enforcement assistance.  The manual states that "the request must not violate the accepted interpretation of Article 3 of the INTERPOL Constitution which prohibits involvement in matters of religious, military, political or racial nature."[63]

67.     Similarly, the federal regulation governing administration of the USNCB, 28 C.F.R. § 0.34, only permits responses to requests that are in agreement with the Interpol Constitution.  In all these ways, and with explicit authority from Congress, DOJ and DOH play a vital role in coordinating Defendant Interpol's efforts.  Moreover, they do so in direct reliance on the Interpol Constitution, specifically Article 3.

### b.  Despite Support From the United States, Defendant Interpol Engages in Repression as an Agent of Malign States

68.     Notwithstanding its longstanding and widely known prohibition against participating in law enforcement against political actions, Defendant Interpol permits authoritarian governments—particularly those that engage in transnational repression—to use Defendant Interpol's notice system to locate, arrest, and extradite their critics.[64]

---

[63] *Interpol-USNCB Requests for Enforcement Assistance or Information,* Interpol, https://www.justice.gov/jm/organization-and-functions-manual-5-interpol-usncb-requests-enforcement-assistance-or

[64] S. 1591, 177th Cong. (2021-2022), available at https://www.congress.gov/bill/117th-congress/senate-bill/1591/text?r=25&s=1.

69.     Defendant Interpol does not vigorously and properly vet the Red Notice requests that it receives from authoritarian regimes; rather, Defendant Interpol quickly publishes alerts to aid in locating and detaining political dissidents.[65]

70.     Defendant Interpol's own data shows this clearly.  In 2021, 353 of its Red Notices were either cancelled after being published or rejected before being published because they were of a "political, military, religious or racial character."[66]  In many instances, these post hoc corrections are too late and, as here, human rights violations have already occurred.  For example, in July 2021, Yidiresi Aishan, an activist who faced extradition from Morocco to China, was arrested based on a Red Notice that Defendant Interpol later cancelled due to its political basis—Aishan remains in captivity to this day.[67]

71.     The election of Defendant Al-Raisi as President of Interpol—an election process that began about one year before Plaintiff Osman was kidnapped—is a clear indication that Defendant Interpol fully intends to continue its work on behalf of malign states and dictators. Indeed, Human Rights Watch called Defendant Al-Raisi's election "a sad day for human rights and the rule of law worldwide," arguing that Defendant Al-Raisi was "a representative of arguably the most authoritarian government in the Gulf, one that equates peaceful dissent with terrorism."[68]

---

[65] *Is Interpol Vulnerable to Political Abuse?*, Open Society Foundations (Jan. 20, 2015), available at https://www.opensocietyfoundations.org/voices/interpol-vulnerable-political-abuse.

[66] *See Interpol Takes Baby Steps Toward Transparency*, Politico (Feb. 1, 2023), available at https://www.politico.eu/article/interpol-baby-steps-transparency-data-red-notice-wanted/.  An additional 150 notices were rejected or cancelled for violating the Interpol constitution's commitment to human rights.  *Id*.

[67] Alexis Thiry, *Politically Motivated Extraditions Are Abetting Transnational Repression*, DAWN (Feb. 28, 2023), available at https://dawnmena.org/politically-motivated-extraditions-are-abetting-transnational-repression/.

[68] *See UAE general accused of torture elected Interpol president*, BBC News (Nov. 25, 2021), available at https://www.bbc.com/news/world-middle-east-59417409.

72.     Congress has recognized Defendant Interpol's malign role as a tool of transnational repression.  On September 12, 2019, during a hearing focusing on Defendant Interpol's malign activities, the Helsinki Commission (the only bi-cameral committee of the U.S. Congress) proclaimed:

> "To silence dissent from abroad, autocrats often turn to the International Criminal Police Organization, known as INTERPOL, to file bogus criminal claims seeking the arrest and extradition of their political targets. This abuse of INTERPOL Red Notices and Diffusions enables autocratic governments to harass and intimidate their opponents thousands of miles away, even within free and democratic societies."[69]

73.     Based on the facts cited above, on December 15, 2021, Congress passed, as part of the National Defense Authorization Act of 2022, the "Transnational Repression Accountability and Prevention Act" ("TRAP Act").  The TRAP Act targets Defendant Interpol's role as a tool of transnational repression schemes, like the plot used against Plaintiff Osman.[70]  In it, Congress declared:

> "It is the sense of Congress that some INTERPOL member countries have repeatedly misused INTERPOL's databases and processes, including Notice and Diffusion mechanisms, to conduct activities of an overtly political or other unlawful character and in violation of international human rights standards, including by making requests to harass or persecute political opponents, human rights defenders, or journalists."

Based on this observation, Congress required that the Attorney General and the Secretary of State "use the voice, vote, and influence of the United States, as appropriate, within INTERPOL's General Assembly and Executive Committee to promote reforms aimed at improving the

---

[69] *Tools of Transnational Repression*, U.S. Helsinki Commission, Commission on Security and Cooperation in Europe (Sept. 12, 2019), available at https://www.csce.gov/international-impact/events/tools-transnational-repression.

[70] *See* 22 U.S.C. § 263b.

transparency of INTERPOL and ensuring its operation consistent with its Constitution, particularly articles 2 and 3[.]"[71]   President Biden signed this bill into law on December 27, 2021.

74.     Pursuant to the TRAP Act, DOJ and the State Department have jointly issued yearly reports to assess Defendant Interpol's Red Notice abuses and other Interpol communications for unlawful purposes.  Although the reports note that Defendant Interpol has begun implementing reforms to minimize Red Notice misuse and that, therefore, Red Notice misuse has declined over the past several years, the reports recognize that Defendant Interpol continues to issue Red Notices in a manner violative of its Constitution.[72]  This was true of the Red Notice issued against Plaintiff Osman, as specified further below.

### E.  Defendant AIMC's Role in Transnational Repression

75.     Similarly, Defendant AIMC facilitates cooperation of Arab countries to, among other activities, enable the issuance of arrest warrants and seek extradition.[73]  When a person wanted for a crime has not been arrested and their location is unknown, the state in which the person is wanted can file a request to Defendant AIMC for its equivalent of Defendant Interpol's Red Notice.  Defendant AIMC can then circulate the arrest warrant to all of its member states to facilitate locating the individual and coordinate with Defendant Interpol (as occurred in Plaintiff Osman's case) to broaden the manhunt.

---

[71] National Defense Authorization Act for Fiscal Year 2022, S. 1605, 117th Cong. (2021-2022). Article 3 of the Interpol Constitution provides: "It is strictly forbidden for the Organization to undertake any intervention or activities of a political, military, religious or racial character."

[72] *See Transnational Repression Accountability and Prevention (TRAP) Act Reports*, U.S. Department of State, available at https://www.state.gov/transnational-repression-accountability-and-prevention-trap-act-reports/.

[73] *See Tiger Team for Criminal Matters: Powers of the Arab Interior Ministers Council*, Al Tamimi & Co., available at https://www.tamimi.com/law-update-articles/tiger-team-for-criminal-matters-powers-of-the-arab-interior-ministers-council/

76.     Defendant AIMC is subject to the Riyadh Arab Agreement for Judicial Cooperation and the Arab Convention for the Suppression of Terrorism, both of which bar extradition in political cases.

    a.  First, Article 41 of the Riyadh Arab Agreement for Judicial Cooperation contains several exceptions under which extradition cannot be carried out, including where extradition is requested for an offense that is "considered by the laws of the requested party as a crime of a political nature."[74] Further, the Agreement guarantees to citizens of all contracting parties the right to obtain legal assistance and defend oneself before a legal body.[75]

    b.  Second, Chapter II Article 6(a) of the Arab Convention for the Suppression of Terrorism also prohibits extradition for offenses that have a political nature under laws in the requested state.[76]

    c.  These restrictions are fully consistent with international law and practice, which seek to protect individuals, including Plaintiff Osman, from arbitrary detention intended as a mechanism of political persecution, consistent with the protections in Interpol's own Constitution.

77.     Despite the tremendous power that Defendant AIMC has to enable locating such persons, Defendant AIMC does not have an oversight committee dedicated to filtering out abuses of its systems, does not grant individuals targeted by their practices access to files or remove arrest

---

[74] *See Riyadh Arab Agreement for Judicial Cooperation*, Part VI, Art. 41, League of Arab States (Apr. 6, 1983), available at https://www.refworld.org/docid/3ae6b38d8.html.

[75] *Id.,* at Art. 3 and 4.  The Agreement limits such rights to citizens "within the borders of each party."  Here, the relevant conduct occurred within party states, to wit: Egypt and the UAE.

[76] *See Arab Convention for the Suppression of Terrorism*, Ch. II Art. 6(a), League of Arab States (Apr. 1998), available at https://www.refworld.org/docid/3de5e4984.html.

warrants that no longer were active against them, and does not have any protective measures in its Basic Laws to prevent human rights abuses.[77]

78.     That said, Defendant AIMC has enabled the arrest of multiple individuals, and the extradition of at least one individual, who were wanted for activities related to their or their families' anti-authoritarian speech.[78]  For example, in January 2023, Hassan Muhammad al-Rabea, a national of Saudi Arabia, was arrested in Morocco based on an AIMC Red Notice and extradited to Saudi Arabia; al-Rabea had fled Saudi Arabia for fear of persecution due to his family's arrests and torture and the charges were based on Saudi Arabia's sweeping anti-terrorism laws.[79]

79.     Aware of these abuses, on June 23, 2023, a group of human rights experts published an open letter to Defendant AIMC stating that their red notices "do not appear to comply with the obligations of Member States under international law," and that "States do not appear to exercise due diligence in assessing the political nature of the charges brought against individuals, and no individual risk assessment appears to be either envisaged or undertaken."[80]  Although the group

---

[77] *See Understanding the Arab Interior Ministers' Council and its role in transnational repression*, MENA Rights Group (Mar. 9, 2023), available at https://www.menarights.org/en/articles/aimc.

[78] *See id.*; *Saudi National Hassan al-Rabea Extradited from Morocco to Saudi Arabia,* MENA Rights Group (Jan. 19, 2023), available at https://www.menarights.org/en/case/hassan-muhammad-al-rabea.

[79] Alexis Thiry, *Politically Motivated Extraditions Are Abetting Transnational Repression* (Feb. 28, 2023), available at https://dawnmena.org/politically-motivated-extraditions-are-abetting-transnational-repression/; *Saudi National Hassan al-Rabea Extradited from Morocco to Saudi Arabia,* MENA Rights Group (Jan. 19, 2023), available at https://www.menarights.org/en/case/hassan-muhammad-al-rabea.

[80] Specifically, the letter stated that Defendant AIMC's red notices do not comply with "principles of non-refoulement, non-discrimination, due diligence and fair trial" and "may implicate the duty to protect the rights to freedom of opinion and expression."  Fionnuala Ni Aolain et al., *Letter* (June 23, 2023), available at https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=28070.

recommended Defendant AIMC to comply with international law and create a legal mechanism by which to evaluate red notices—and even offered technical assistance on any of the issues raised—Defendant AIMC has made no such changes or otherwise responded to the letter.

### F.  Plaintiff Osman is a Victim of Defendants' Transnational Repression

#### a.  <u>Plaintiff Osman's 1st Amendment Advocacy in the United States</u>

80.     Plaintiff Osman was born in Egypt in 1976.  In 1998, Plaintiff Osman graduated from Egypt's military academy and began his career as a military cadet.  For the next seven years, he served as an Egyptian air force captain.

81.     As Plaintiff Osman rose through the ranks, he grew disheartened from the wrongdoing he witnessed within the highest levels of Defendant Egypt's armed forces.  By the time Plaintiff Osman was 28 years old, he was serving as an Egyptian air force captain, which gave him an inside view of the corruption within Defendant Egypt's government and bureaucracy, including misuse of government funds by senior officials.

82.     In December 2004, Plaintiff Osman left his birth country and traveled to the United States to attend a military-sponsored English language course.  He never returned to Defendant Egypt.  On April 30, 2013, Plaintiff Osman became a U.S. citizen.

83.     Now a citizen and resident of the United States, Plaintiff Osman is still an Egyptian citizen despite his efforts to abandon his citizenship.  He is considered a "deserter" in Defendant Egypt.

84.     After coming to the United States, Plaintiff Osman began publicly criticizing Defendant Egypt for its repression of its citizens.  To that end, Plaintiff Osman has used online social media and content-sharing platforms to vocalize his dissent.

85.     In 2006, Plaintiff Osman launched the @SherifOsmanClub YouTube channel.[81] Plaintiff Osman used the channel as his platform to post video content, both in Arabic and English. The content of the videos varied but they were primarily focused on Plaintiff Osman's commentary and criticism of Defendant Egypt's government and the actions of its leaders.

86.     Plaintiff Osman primarily criticized the el-Sisi Regime as well as abuses in Defendant Egypt's eroding legal system and Defendant Egypt's history of imprisoning people without lawful process or basis.

87.     Plaintiff Osman's criticism of the Egyptian government garnered a substantial following and Plaintiff Osman made a name for himself as a vocal political commentator.  His YouTube account garnered nearly 36,000 subscribers.

88.     In 2011, shortly after the onset of the Arab Spring,[82] Plaintiff Osman began corroborating allegations of corruption by and within the Egyptian government and legal system, and then broadcasting them on his YouTube channel; over time, he aired claims about the relocation of government money and gold to the Bahamas, as well as allegations concerning some judges who were bribed and other judges who were illegally jailed.

89.     In the period between August 30, 2022, and October 31, 2022, Plaintiff Osman posted 31 videos comprising the COP27 Video Series.  In the videos, Plaintiff Osman encouraged Egyptian citizens to peacefully protest at COP27, which was to be held in Defendant Egypt in November 2022.

---

[81] Sherif Osman, YouTube, available at https://www.youtube.com/@SherifOsmanClub.

[82] The Arab Spring was a series of anti-government protests, uprisings, and armed rebellions that spread across much of the Arab world beginning in the early 2010s.

90.     Plaintiff Osman and other human rights activists saw COP27 as an opportunity to gather protesters because the conference attracted global participants and attention and, therefore, many activists believed Defendant Egypt would be measured in its response to protest.

91.     Catching wind of this movement, in the weeks leading up to the summit, Egyptian authorities arrested dozens of individuals calling for the anti-government protests (on charges such as "misusing social media" and "joining a terrorist group") and restricted the right to protest.[83] For example, Egyptian authorities began surveilling conversations in taxi cabs and arbitrarily stopping citizens, forcing them to turn over their phones, and checking their social media content.[84]

92.     Undeterred, on November 12, 2022, demonstrators ultimately gathered at COP27 to protest climate policies and human rights abuses in Defendant Egypt, including the ongoing imprisonment of Alaa Abd El Fattah, an activist who was arrested and incarcerated for condemning Defendant Egypt's authoritarian government.[85]

93.     Plaintiff Osman's participation in calls for COP27 protests garnered significant attention not only from supportive protesters but also from Egyptian authority and supporters of the el-Sisi Regime.  While Plaintiff Osman was in the United States, however, he was out of the Egyptian government's physical reach and was instead threatened and harassed online.  Plaintiff Osman received an increasing number of death threats and threats of violence after each COP27 video that he posted.  For example, throughout the COP27 Video Series, countless individuals sent direct messages to Plaintiff Osman threatening that he would end up like Hisham Ashmawy, a

---

[83] *Egypt:  Arrests, Curbs on Protests As COP27 Nears*, Human Rights Watch (Nov. 6, 2022, 12:00 AM), https://www.hrw.org/news/2022/11/06/egypt-arrests-curbs-protests-cop27-nears.

[84] *Id.*

[85] Jenny Gross, *U.N. Climate Summit Leads to a Rarity in Egypt:  Open Protest*, New York Times (Nov. 12, 2022), https://www.nytimes.com/2022/11/12/climate/cop27-protests-egypt.html.

former Egyptian officer who, at the direction of the Egyptian government, was arrested in Libya, extradited to Defendant Egypt, sentenced to death, and hanged for terrorism charges. Plaintiff Osman also received threats that he would be kidnapped or stabbed in the back.

94.     Defendants Egypt and el-Sisi directed and used Egyptian intelligence officials to monitor Plaintiff Osman's YouTube account closely, and those Intelligence Officers, Defendants John Doe 1 and John Doe 2, directed online attackers to threaten Plaintiff Osman in the United States. Also at Defendants Egypt's and el-Sisi's direction, Defendants John Doe 1 and Joe Doe 2 began tracking and surveilling Plaintiff Osman in the United States using Defendant Egypt's spy network. Defendants Egypt and el-Sisi knew this malign conduct would be, and did, take place on U.S. soil.

95.     On October 31, 2022, Plaintiff Osman posted the final video of the COP27 Video Series. This final video, receiving over 60,000 views, struck a particular chord with Defendant Egypt and started the series of events that led to his kidnapping in which the Defendants were complicit.

   b. **Plaintiff Osman is Placed Under Surveillance in the United States by the el-Sisi Regime**

96.     As is customary in the face of its political dissidents, Defendants Egypt and el-Sisi became aware of Plaintiff Osman's anti-Egyptian rhetoric and began surveilling his activities in the United States.

97.     Defendants Egypt and el-Sisi monitored Plaintiff Osman's social media activity, including his Twitter and YouTube accounts. Defendants Egypt and el-Sisi, or other officials of the el-Sisi Regime, viewed Plaintiff Osman's COP27 Video Series.

98.     All surveillance of Plaintiff Osman was conducted at the direction of Defendants Egypt and el-Sisi, leading to knowledge that a trip Plaintiff Osman planned to take to Dubai in

November 2022 would provide a perfect opportunity to have him arrested on bogus and politically motivated charges.[86]

### c. **Plaintiff Osman is Kidnapped During a Family Visit in Defendant UAE**

99.     Plaintiff Osman's sister moved to Dubai from Defendant Egypt in 2006.  On at least four occasions between 2014 and 2022, Plaintiff Osman traveled safely to Dubai to visit his mother and sister without issue despite his operation of his @SherifOsmanClub YouTube channel.

100.     On November 2, 2022, less than a week after his final video calling for protests related to COP27, and in the midst of the torrent of death threats, Plaintiff Osman and his fiancée, Saija Virta, departed from Logan Airport in Boston, Massachusetts with Dubai as their ultimate destination.  To Plaintiff Osman's knowledge, only those involved in his travels plan knew the details of his trip.

101.     During a layover in Amsterdam, Plaintiff Osman left the airport to meet friends for coffee.  Despite passing through passport and border control twice, Plaintiff Osman was never stopped, questioned, or detained, and was never notified of or questioned in relation to any Red Notices issued by Defendants Interpol or AIMC.

102.     On November 4, 2022, Plaintiff Osman and Virta arrived in Dubai.  Plaintiff Osman's mother, a 72-year-old retired military doctor who lives in Defendant Egypt, planned to join Plaintiff Osman, his sister, and Virta in Dubai.  However, on November 4, 2022, her outbound ticket was cancelled and she was inexplicably banned from leaving Defendant Egypt.

---

[86] Plaintiff Osman has been surveilled abroad as well.  As recently as July 11, 2023, while Plaintiff Osman was in Europe attending a human rights conference, two men followed Plaintiff Osman to a restaurant and took a video of him.

103.    On November 6, 2022, two unknown men in plainclothes, Defendants John Doe 3 and John Doe 4, approached Plaintiff Osman while he stood outside of a restaurant with his family after lunch.  Defendant John Doe 3 stopped on Plaintiff Osman's left side.  Defendant John Doe 4, standing on Plaintiff Osman's right, asked for his name.  Defendant John Doe 3 displayed Dubai Police identification but did not identify himself or explain why they approached Plaintiff Osman. Defendant John Doe 4 grabbed Plaintiff Osman's arm and did not release it, restricting his ability to flee or free himself.  Plaintiff Osman tried to get away and said he needed to retrieve his passport from the car.  One of the men told Plaintiff Osman that he had to go with them and threatened him not to make a scene or "things will get worse for you."  Defendants John Does 3 and 4 then escorted Plaintiff Osman into an unmarked car against his will.

104.    Defendants John Does 3 and 4 placed Plaintiff Osman in the back of an unmarked vehicle and activated the child safety locks.  A surveillance camera recorded the backseat of the vehicle.  One of the men sat in the rear of the car with Plaintiff Osman.  They instructed Plaintiff Osman to turn off his phone and immediately confiscated it, placing it out of reach under an armrest.  Despite Plaintiff Osman pleading for information, Defendants John Does 3 and 4 provided none and instead told Plaintiff Osman that "going home was not a guarantee."  The purported officers did not provide an arrest warrant, an explanation for his abduction, or any further information.

105.    Defendants John Does 3 and 4 then handcuffed Plaintiff Osman and brought him into a law enforcement building.

### d. **Plaintiff Osman Learns of Defendant Interpol's Direct Involvement in His Kidnapping**

106. Defendants John Does 3 and 4 escorted him into a Dubai police building. They brought him into a room marked "Interpol Headquarters" on the door in Arabic; inside, one wall had a large Interpol logo. Plaintiff Osman was photographed in front of the Interpol logo.

107. Plaintiff Osman was taken to and seated in another room, which was surveilled by three officers and surveillance cameras. He was told not to leave the room. On one officer's phone, Plaintiff Osman observed a screenshot photograph of him from one of his YouTube videos posted in or around 2021.

108. For hours, Plaintiff Osman desperately pled for information. Defendants John Does 3 and 4 finally told him that an Interpol Red Notice had been issued against him and Egyptian authorities requested his extradition to Egypt. They asked Plaintiff Osman if he would agree to be extradited to Egypt; if he agreed, the officers said he would be sent to Egypt within a week or less. Plaintiff Osman refused. He said that he would only leave Dubai to go to the United States; Plaintiff Osman knew he would be tortured or killed if he was sent to Egypt.

109. On November 8, 2022, two days after his abduction, Plaintiff Osman met with a Dubai Central Jail Interpol Liaison, Defendant Madani, via Skype video conference; the Skype screen indicated that the interview was being recorded. As the Interpol Liaison, Defendant Madani had special access to Defendant Interpol's databases.

110. During the November 8 meeting, Defendant Madani told Plaintiff Osman that his arrest was based on an Interpol Red Notice issued at Defendant Egypt's request and that the extradition request related to an open criminal case stemming from Plaintiff Osman's conduct in Defendant Egypt in 2019. This was impossible: Plaintiff Osman had not traveled to Defendant Egypt since 2004 and had traveled internationally to other countries several times since 2019 with

no issue or notification of any Interpol Red Notice.  Indeed, Defendant Madani could not explain why no Red Notice was triggered when Plaintiff Osman traveled to Dubai and went through passport control numerous times since the alleged case against him.  Specifically, Defendant Madani told Plaintiff Osman that he had been charged with inciting violence against government institutions; Defendant Madani never showed Plaintiff Osman the charging document originating from the Egyptian government.

111.    After Plaintiff Osman met with Defendant Madani, the facility officials took Plaintiff Osman and eight other inmates, who all told Plaintiff Osman that they had also been detained due to Interpol Red Notices, to the Dubai Central Jail.  At that time, Plaintiff Osman did not receive any further information about his detention and was not permitted to call his family or an attorney.

112.    The political nature of the apparent charges was clear and obvious.  On the face of Defendant UAE's own Government of Dubai prosecution memo, which was dated November 8, 2022, was the following description of the charges (a copy of which Plaintiff Osman never obtained while detained):  "**Encouraging or inciting by publishing information on the internet or through means of information technology and not complying with the state's legislation in force**."[87]  This document was apparently drafted by Defendant Madani, as his name appears as the assigned prosecutor.  The document has a code at the top: "138/extradition/2022."    The reference to "extradition" is a reflection that the "charges" stemmed from a warrant outside of Defendant UAE, although the name of Defendant Egypt appears nowhere on the memo.   It was clear that the purpose of Plaintiff Osman's detention was to punish him for his political dissidence

---

[87] Exhibit 2 (emphasis added).

and instill fear in other political dissenters; Plaintiff Osman would be released only once the political dissent against Defendant Egypt ceased in its entirety.

113. Meanwhile, after watching Plaintiff Osman kidnapped in the light of day, Plaintiff Osman's family panicked. UAE law enforcement initially told Plaintiff Osman's family that they were not aware of any legal basis for his arrest and that their system did not indicate a case number for Plaintiff Osman nor any charges supporting his arrest.

114. Eventually, UAE law enforcement informed Plaintiff Osman's family that he was detained pursuant to an Interpol Red Notice. This information concerned Plaintiff Osman's family because Defendant Interpol's president, Defendant Al-Raisi, had been investigated for torture as recently as May 2022.[88]

115. Virta contacted Charles E. McClellan, a U.S. Department of State Foreign Services Officer in the U.S. Consulate in Dubai, who leads the American Citizens Services division, to seek further information regarding Plaintiff Osman's detention. McClellan agreed to make inquiries.

116. On November 15, 2022, McClellan spoke to Defendant Madani, who told him that Defendant Interpol had issued a Red Notice and assigned Plaintiff Osman a case number: "Interpol Extradition Case #138/2022."

117. Shortly thereafter, the narrative changed.

### e. Plaintiff Osman Learns of Defendant AIMC's Role in his Detention

118. On November 28, 2022, after a non-governmental organization, "Detained in Dubai," published a story about Defendant Interpol's detention of Plaintiff Osman, Defendant Interpol's press office informed Detained in Dubai's Chief Executive Officer, Radha Stirling, that

"there is no Red Notice or diffusion for Sherif Osman."   Stirling forwarded the message to McClellan.

119.    On November 30, 2022, McClellan informed Stirling that the UAE officials were now saying something different.  They now told McClellan that Plaintiff Osman had been arrested pursuant to an AIMC Red Notice.[89]

120.    Accordingly, sometime between November 15, 2022—when McClellan received the Interpol case number—and November 28, 2022—when Defendant Interpol informed Stirling that no Red Notice existed for Plaintiff Osman—Defendants Interpol and AIMC colluded to shift the purported justification for Plaintiff Osman's imprisonment from an Interpol Red Notice to an AIMC Red Notice.[90]

121.    This conspired action was agreed upon at a virtual meeting held on or around November 17, 2022, during which Defendant AIMC agreed to issue its own Red Notice to provide justification for the imprisonment of Plaintiff Osman.  Defendant Al Nahyan, who served as UAE's Deputy Prime Minister and Interior Minister (and praised Defendant Al-Raisi's election as

---

[89] On March 23, 2023, the Commission for the Control of Interpol's Files ("CCF") confirmed that there is no data registered in the Interpol Information System from Egypt concerning Plaintiff Osman.  This does not mean that Defendant Interpol never issued a Red Notice for Plaintiff Osman's arrest—it likely means that Defendant Interpol issued a Red Notice and subsequently deleted it.  Indeed, member countries may submit requests to CCF to delete data.  Moreover, in instances where data falls short of the legal requirements under Defendant Interpol's constitution or rules, CCF recommends such data be deleted.  Edward Grange, *Interpol Takes Baby Steps Toward Transparency*, Politico (Feb. 1, 2023, 4:37 AM), https://www.politico.eu/article/interpol-baby-steps-transparency-data-red-notice-wanted/.

[90] Under Defendants Interpol and AIMC's "Memorandum of Understanding," the agencies share information concerning wanted individuals; Article 2 of the Memorandum states that Defendants Interpol and AIMC "shall ensure full and prompt exchange of non-nominal information and documents concerning matters of common interest."  Both Defendants Interpol and AIMC have some form of policy prohibiting extradition for political activities.

Defendant Interpol's President[91]) was among the meeting's attendees and participated in the decision to change the Red Notice narrative.

122.    During this time, Defendant Al-Raisi was aware of, and approved, Plaintiff Osman's continued detention.

123.    Despite the plain attempts to establish a pretextual explanation for Plaintiff Osman's imprisonment, one fact is clear:  Defendants Al-Raisi, Interpol, and AIMC played a direct role in locating and kidnapping Plaintiff Osman.  Defendants UAE's, Interpol's, and AIMC's systems, false documentation, and personnel supplied Defendant Egypt with resources critical to its terrorist acts and strengthened its ability to target an American in Defendant UAE knowing Defendant Egypt's true intentions when requesting his extradition.  Ultimately, Defendants Interpol and AIMC each played a role in terrorizing Plaintiff Osman and similar political dissidents from engaging in public discourse against the Egyptian regime.

124.    On December 7, 2022, a group of United Nations Special Rapporteurs wrote a letter to Defendant UAE noting their concerns that Plaintiff Osman was arbitrarily arrested and detained, suggesting that Defendant UAE failed to acknowledge deprivation of liberty by its agents, and raising the alarming risk of torture or ill-treatment that Plaintiff Osman could face if extradited to Defendant Egypt.  The letter cited suggestively to several United Nations resolutions that Defendant UAE could be violating and requested that the UAE "proceed without delay with an independent and thorough individual risk assessment by the competent judicial authorities . . . with a view to ascertain that Mr. Osman would be not be at risk of serious human rights violations if returned to Egypt."  The letter additionally requested that Defendant UAE respond to the letter by

---

[91] Ayse Wieting and Suzan Fraser, *Interpol Elects United Arab Emirates Official As President*, AP News (Nov. 25, 2021), https://apnews.com/article/europe-middle-east-china-crime-international-law-cc039b8213bfe30104362aa53b7c9cb4.

providing, among other information, comment on the allegations against Plaintiff Osman, information regarding the legal and procedural safeguards provided to Plaintiff Osman from the outset of his arrest (including his right to be informed of the reasons for his arrested and the right to legal representation), the legal grounds under which Plaintiff Osman's extradition was requested and the judicial procedure undertaken to establish its legitimacy, detailed information on any risk assessment carried out, and information concerning Plaintiff Osman's arrest and his place of detention "during the six hours of his alleged enforced disappearance."[92]

### f.   **Plaintiff Osman Narrowly Escapes Extradition**

125.    Plaintiff Osman was held as a prisoner in the Dubai Central Jail until December 22, 2022.  During his imprisonment, he lived in constant terror, fearing he would be extradited against his will at any moment.  Plaintiff Osman knew that, if extradited, he faced torture or death in Defendant Egypt.

126.    Throughout his detention, Plaintiff Osman was denied basic rights for detainees. For over a month, he was denied access to counsel and was not permitted to sign a power of attorney.  He was denied access to his family.  Moreover, Plaintiff Osman's detention was continuously extended in 15-day and 30-day increments without any explanation.

127.    Over time, and as other organizations and governments became aware of his dire situation, Plaintiff Osman's family became increasingly fearful.  On several occasions, Plaintiff Osman's family requested to visit Plaintiff Osman, but their in-person visitation requests were rejected and, although they received approval for multiple virtual visitations, they received a virtual visitation link only once.  Plaintiff Osman's family felt helpless.

---

[92] *See* Exhibit 3.

128.     Plaintiff Osman's detention was an act of transnational repression.   Indeed, Defendants Interpol and AIMC, as well as Defendants Egypt and UAE, sought to send a message not only to Plaintiff Osman and his family, but also to political dissidents of Egypt, to refrain from anti-authoritarian speech or else to face detention, extradition, torture, and even death.

129.     On December 22, 2022, three unnamed plainclothes officers told Plaintiff Osman that they had received a "message from above" that Plaintiff Osman would be released.   He was provided no explanation about who made that decision "from above" or what happened with any Red Notice lodged against him.   He was provided nothing—no information supporting that any "official" case had been closed.   It became even more clear to Plaintiff Osman that he had been kidnapped and that the use of Defendants' Red Notices, liaisons, and rationales, and the UAE law enforcement's "official" facilities and personnel, were all tools in a sham scheme attempting to make the kidnapping look like anything other than what it was:  an act of terrorism.

130.     Thus, forty-six days after his kidnapping, Plaintiff Osman was released.   To his day, he does not know why he was kidnapped—other than to instill fear in him and other political dissenters for their expressions against Defendant Egypt.

### g.  Egypt's Actions Were Intended To Evade Treaty Obligations

131.     In 1998, the United States and Egypt signed a Treaty on Mutual Legal Assistance in Criminal Matters.   Under that Treaty, Egypt could have made a request for Plaintiff Osman's arrest and extradition directly to the United States.

132.     However, Egypt knew full well the United States would have denied that request. Under Article 3(1), either country could deny an extradition request if the request violated the

"essential interests" of the non-requesting state.[93]  In a diplomatic note from April 22, 1998, the United States made clear to Egypt, and Egypt agreed, that a request for an extradition based on a purely political offense would offend Article 3(1).[94]

133.    Plainly, Egypt's decision to use Defendants UAE, Interpol, and AIMC to carry out Plaintiff Osman's arrest and detention was a bald move to avoid its obligations under the MLAT Treaty.

### h.  Plaintiff Osman Sustained Extensive Harm

134.    Plaintiff Osman returned to the United States a shell of his former self.  No aspect of his life was untouched.  As a result of Defendants' conduct and the roles they played in his kidnapping, Plaintiff Osman was traumatized, his start-up business was destroyed, his speech was chilled, and he now suffers from post-traumatic psychological damage.

135.    Since Plaintiff Osman's release, beginning in or around January 2023, he has been receiving treatment biweekly from a psychologist for post-traumatic stress.  Plaintiff Osman's

---

[93] The Senate's Committee on Foreign Relations explained the purposes and effects of "essential interest" clauses in MLAT treaties in a report on October 4, 2000, with language that bears particular relevance here:  "Although the essential interests clause is almost always couched with national security, it is generally understood to be more inclusive than the language alone might suggest. The most commonly cited examples are (1) **requests 'involving prosecution by the Requesting State of conduct that occurred in the Requested State that is constitutionally protected in the Requested State'** and (2) requests for sensitive law enforcement information where the 'senior foreign government official who likely will have access to the information is engaged in or facilitates the production or distribution of illegal drugs, and is using the request to the prejudice of a United States investigation or prosecution.'"  *See* S. 106-24, available at https://www.govinfo.gov/content/pkg/CRPT-106erpt24/html/CRPT-106erpt24.htm    (emphasis added).

[94] President of the United States, *Letter of Transmittal* (Feb. 2, 2000), available at https://www.congress.gov/106/cdoc/tdoc19/CDOC-106tdoc19.pdf   ("In a diplomatic note dated April 22, 1998, the United States restated the understanding of the negotiating delegations that the 'security or similar essential interests' provision in Article 3(1) provided an adequate basis upon which to deny assistance requests in cases the United States would consider political offenses.  A reply note from Egypt acknowledges the Parties' understanding on this issue").

psychological damage has been devastating; each time he steps outside of his home, Plaintiff Osman feels panicked and experiences debilitating anxiety.  He has experienced severe mental anguish and extensive emotional pain and suffering.

136.    Plaintiff Osman's business was also damaged and derailed.  One investor, who was based part-time in Dubai, saw Plaintiff Osman's story in the news and pulled his commitment to invest $250,000 in Plaintiff Osman's business.  Plaintiff Osman has not yet replaced the investor's committed funding.  Additionally, because of the trauma that Plaintiff Osman endured while detained, it has been extremely difficult for him to focus on building his business.

137.    Further, Plaintiff Osman's reputation was irrevocably tarnished and irreplaceable family relationships were damaged.  Specifically, his sister, now in fear to associate with him, has not spoken to Plaintiff Osman since he returned to the United States.  In addition, friends and colleagues worry of retaliation if they associate with Plaintiff Osman and have abandoned him out of fear.

138.    For months Plaintiff Osman feared participating in political activism, but he intends to resume advocating for democratic principles in Egypt and against the el-Sisi Regime, including on social media platforms.  Additionally, Plaintiff Osman routinely traveled abroad to visit his family in Dubai and elsewhere prior to his kidnapping.  He intends to resume international travel, as consistent with his prior travel patterns, to see his family as well as to continue his advocacy work at global summits.

139.    Neither Defendant Interpol nor Defendant AIMC maintain a complete public record of notices.  The lack of information from Defendants puts Plaintiff Osman at imminent and substantial risk of future harm.  Moreover, this lack of information leaves Plaintiff Osman with no

constitutionally adequate way to challenge the chilling effects by Defendants on his constitutional First Amendment rights to engage in advocacy.

**FIRST CAUSE OF ACTION**

***Against Defendants Interpol and AIMC***

(Declaratory Judgment)

140.    Plaintiff Osman repeats and realleges the allegations in paragraphs 1-139 as if fully set forth herein.

141.    Article 3 of Defendant Interpol's Constitution provides:  "It is strictly forbidden for the Organization to undertake any intervention or activities of a political, military, religious or racial character."  Defendant Interpol's own guidance outlines standards for enforcing its Constitution, particularly that Article 3 shall be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context" and guided by canons of international law.  Similarly, Article 2 of Defendant Interpol's Constitution requires that Defendant Interpol conduct itself in the spirit of the Universal Declaration of Human Rights.

142.    Numerous acts taken by Congress demonstrate that the United States has relied on and acknowledged Defendant Interpol's Constitution.

143.    With 22 U.S.C. § 263a, Congress authorized the Justice Department to become a member of Defendant Interpol and, in so doing, implicitly incorporated Defendant Interpol's Constitution as an essential aspect of the relationship between the United States, its citizens, and Defendant Interpol.

144.    In 1958, Congress passed legislation that enabled the creation of the U.S. National Central Bureau.  In doing so, Congress, again, implicitly incorporated the Interpol constitution as an essential aspect of the relationship between the United States, its citizens, and Defendant Interpol.

145.   Congress explicitly recognized Defendant Interpol's Constitution generally, and Articles 2 and 3 specifically, in passing 22 U.S.C. § 263b, the Transnational Repression Accountability and Prevention Act, finding that Defendant Interpol allowed member states to misuse Red Notices, among other processes, to "conduct activities of an overtly political or other unlawful character and in violation of international human rights standards, including by making requests to harass or persecute political opponents, human rights defenders, or journalists."  This provision became effective on December 27, 2021—almost a year before Plaintiff Osman's release from his UAE jail, based on the malign Egyptian warrant.

146.   Other governmental actions further underscore U.S. recognition of and reliance on Defendant Interpol's Constitution:   Pursuant to 28 C.F.R. § 0.34, which governs federal administration of the USNCB, the USNCB may only respond to a request for law enforcement assistance if it aligns with Defendant Interpol's constitution; Justice Department policy for the handling of Interpol-USNCB requests for enforcement assistance explicitly states that "the request must not violate the accepted interpretation of Article 3 of the INTERPOL Constitution which prohibits involvement in matters of religious, military, political or racial nature."

147.   Defendant AIMC is subject to the Riyadh Arab Agreement for Judicial Cooperation and the Arab Convention for the Suppression of Terrorism, both of which prohibit extradition for offenses of a political nature.

148.   The Riyadh Arab Agreement for Judicial Cooperation explicitly recognizes individual rights to institute litigation; Article 3 of the Agreement—"Assurance of the Right of Litigation"—states that "[c]itizens of the contracting parties shall enjoy within the borders of each party the right of litigation before legal bodies to demand and defend their rights."

149.     Plaintiff Osman's rights against arbitrary detention, persecution, and based on charges stemming from his constitutionally protected right to free expression in the United States, all of which occurred within the borders of Egypt and the UAE, are derived from Defendant Interpol's Constitution, the Riyadh Arab Agreement for Judicial Cooperation and Arab Convention for the Suppression of Terrorism, as well as from international law.

150.     Plaintiff Osman's rights against arbitrary detention, persecution, and based on charges stemming from his constitutionally protected right to free expression in the United States are judicially remediable.

151.     An actual case or controversy exists between the Parties, as Plaintiff Osman intends to continue traveling abroad and engaging in advocacy for democratic reforms in Egypt, including through social media, both of which resulted in Defendant Interpol and Defendant AIMC's malign actions.

## SECOND CAUSE OF ACTION

### *Against All Defendants*

(Anti-Terrorism Act, 18 U.S.C. § 2333)

152.     Plaintiff Osman repeats and realleges the allegations in paragraphs 1-151 as if fully set forth herein.

153.     The kidnapping, abduction, imprisonment, prosecution, and threatened extradition of Plaintiff Osman, which were caused by Defendants Egypt, el-Sisi, UAE, Al-Raisi, Al Nahyan, AIMC, Interpol, Madani, and John Does 1–4, pursuant to pretextual Red Notices in violation of Defendant Interpol's constitution and policies of Defendant AIMC's member states, constitute acts of international terrorism pursuant to 18 U.S.C. § 2331.

154.     The acts of terrorism committed by Defendants violated the criminal laws of the United States and numerous States, or would have violated those laws had they been committed

within the jurisdiction of the United States or of the States, including but not limited to 18 U.S.C. § 2332b (prohibiting terrorist acts of kidnapping).

155.    The acts of terrorism committed by Defendants—part of the el-Sisi Regime's campaign of transnational repression—were intended to intimidate and coerce Plaintiff Osman and other perceived dissidents of Defendant Egypt in the United States, in Defendant Egypt, and globally to cease online speech and activism critical of Defendant Egypt's government.

156.    The acts of terrorism committed by Defendants primarily occurred outside the territorial jurisdiction of the United States.

157.    Plaintiff Osman is a United States national who was injured in his person, property, and/or business by reason of the terrorist activity.  Plaintiff Osman suffered economic, physical, and emotional injuries proximately caused by the malign activity.

### THIRD CAUSE OF ACTION

***Against Defendants UAE, Al-Raisi, Al Nahyan, AIMC, Interpol, Madani, and John Does 1–4***

(Anti-Terrorism Act, 18 U.S.C. § 2333) (Material Support Predicate)

158.    Plaintiff Osman repeats and realleges the allegations in paragraphs 1-157 as if fully set forth herein.

159.    Defendants UAE, Al-Raisi, AIMC, Interpol, Madani, and John Does 1–4 provided material support to Defendant Egypt, which acts constitute international terrorism pursuant to 18 U.S.C. § 2331.

160.    Defendants UAE, Al-Raisi, AIMC, Interpol, Madani, and John Does 1–4, by providing their Red Notice services that Defendant Egypt used to locate Plaintiff Osman, personnel to process and prosecute Plaintiff Osman, and facilities to detain Plaintiff Osman, provided material support to terrorist activities in violation of 18 U.S.C. § 2339A, which constitutes an act of international terrorism under 18 U.S.C. §§ 2331, 2333(a).

a.  Defendants Al-Raisi and Interpol provided their Red Notice services to locate Plaintiff Osman and their personnel to process and prosecute Plaintiff Osman and facilities to detain Plaintiff Osman.

b.  Defendants UAE and Al Nahyan provided UAE personnel to abduct, process, and prosecute Plaintiff Osman and UAE facilities to process and detain Plaintiff Osman.

c.  Defendant Madani used his services as UAE prosecutor and Interpol Liaison to process and prosecute Plaintiff Osman.

d.  Defendant AIMC used its services, namely issuance of a Red Notice, to locate Plaintiff Osman.

e.  John Does 1–2 used its services to surveil and spy on Plaintiff Osman.

f.  John Does 3–4 used their services to arrest and detain Plaintiff Osman in Defendant UAE.

161.    Defendants UAE, Al-Raisi, AIMC, Interpol, Madani, and John Does 1–4 knew or recklessly disregarded that the material support and resources that they provided to Defendant Egypt were used in preparation for Egypt attempting or conspiring to engage in physical violence with the intent to cause serious bodily injury to Plaintiff Osman in violation of 18 U.S.C. § 2332(c) or attempting or conspiring to torture Plaintiff Osman in violation of 18 U.S.C. § 2340A.

162.    The acts of terrorism committed by Defendants UAE, Al-Raisi, AIMC, Interpol, Madani, and John Does 1–4 through their provision of material support to Defendant Egypt violated the criminal laws of the United States and numerous States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States, including but not limited to 18 U.S.C. § 2339A.

163.    The acts of terrorism committed by Defendants UAE, Al-Raisi, AIMC, Interpol, Madani, and John Does 1–4 through their provision of material support to Egypt involved violent acts and acts dangerous to human life.  Defendants UAE's Al-Raisi's, AIMC's, Interpol's, Madani's, and John Does 1–4's conduct was also intended to intimidate and coerce Plaintiff Osman and other perceived dissidents of Defendant Egypt in the United States, in Defendant Egypt, and globally to cease online speech and activism critical of Defendant Egypt's government.

164.    The acts of terrorism committed by Defendants UAE, Al-Raisi, AIMC, Interpol, Madani, and John Does 1–4 through their provision of material support to Defendant Egypt primarily occurred outside the territorial jurisdiction of the United States.

165.    Plaintiff Osman is a United States national who was injured in his person, property, and/or business by reason of the terrorist activity.  Plaintiff Osman suffered economic, physical, and emotional injuries proximately caused by the activity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment and relief as follows:

A.    A declaration that Defendants Interpol and AIMC violated prohibitions against undertaking intervention or activities of a political character, through their involvement in Plaintiff Osman's attempted extradition to Egypt on charges that concerned the exercise of his First Amendment-protected advocacy;

B.    Enter a permanent injunction requiring Defendant Interpol to refrain from issuing a future Red Notice against Plaintiff Osman based on any charges from Egypt that concern the exercise of his First Amendment-protected advocacy, and rescind any outstanding warrant or notice issued against Plaintiff Osman based on the same;

C.      Award Plaintiff Osman compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

D.      Award Plaintiff Osman reasonable attorney's fees and costs incurred in connection with this action; and

E.      Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Osman demands trial by jury of all claims triable to a jury in this action.

Dated: New York, New York
        July 20, 2023

WALDEN MACHT & HARAN LLP

By: _____

Jim Walden (**DC Bar #NY0548**)
Avni P. Patel (pro hac vice to be filed)
Deanna Paul (pro hac vice to be filed)
250 Vesey Street, 27th Floor
New York, NY 10281
(212) 335-2030