**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHERIF OSMAN<br><br>   *Plaintiff*,<br><br>  v.<br><br>INTERNATIONAL CRIMINAL POLICE ORGANIZATION, THE ARAB INTERIOR MINISTERS COUNCIL, EGYPT, ADBEL FATTAH EL-SISI, UNITED ARAB EMIRATES, AHMED NASSER AL-RAISI, SAIF BIN ZAYED AL NAHYAN, ISMAIL ALI MADANI, JOHN DOES 1-4,<br><br>   *Defendants*. | Case No. 1:23-cv-02108-TJK |

**MOTION TO DISMISS THE COMPLAINT BY THE INTERNATIONAL CRIMINAL
POLICE ORGANIZATION – INTERPOL**

  Pursuant to Federal Rule of Civil Procedure 12(b)(1), (2), and (6), the International Criminal Police Organization (INTERPOL), respectfully moves this Court to dismiss the claims against it. As set forth in the accompanying Memorandum of Law in Support of INTERPOL's Motion to Dismiss Plaintiff's Complaint, this Court lacks subject matter jurisdiction over Plaintiff's claims against INTERPOL, and lacks personal jurisdiction over INTERPOL; and Plaintiffs have failed to state claims upon which relief can be granted. INTERPOL is making this limited appearance for the sole purpose of moving to dismiss, including on the ground that it is immune from this suit, and in so doing, INTERPOL does not waive any of its immunities.

  For these reasons, INTERPOL respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety as to INTERPOL with prejudice.

DATED: December 18, 2023                 Respectfully submitted,

                                         MUNGER, TOLLES & OLSON LLP


                                         */s/ Ginger D. Anders*
                                         _____

                                         Ginger D. Anders (D.C. Bar No. 494471)
                                         Munger, Tolles & Olson LLP
                                         601 Massachusetts Avenue NW,
                                         Suite 500 E
                                         Washington, DC 20001
                                         Telephone: (202) 220-1100
                                         Ginger.Anders@mto.com

                                         Robert E. Bowen (pro hac vice pending)
                                         Munger, Tolles & Olson LLP
                                         350 South Grand Avenue
                                         Fiftieth Floor
                                         Los Angeles, CA 90071
                                         Telephone: (213) 683-9100
                                         Robert.Bowen@mto.com

                                         *Counsel for the International Criminal Police*
                                         *Organization (INTERPOL)*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

SHERIF OSMAN,

        *Plaintiff*,

    v.

INTERNATIONAL CRIMINAL POLICE
ORGANIZATION, THE ARAB INTERIOR
MINISTERS COUNCIL, EGYPT, ADBEL
FATTAH EL-SISI, UNITED ARAB
EMIRATES, AHMED NASSER AL-RAISI,
SAIF BIN ZAYED AL NAHYAN, ISMAIL
ALI MADANI, JOHN DOES 1-4,

        *Defendants*.

Case No. 1:23-cv-02108-TJK

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERPOL'S MOTION TO DISMISS

MUNGER, TOLLES & OLSON LLP

*/s/ Ginger D. Anders*

Ginger D. Anders (D.C. Bar No. 494471)
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW,
Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
Ginger.Anders@mto.com

*Counsel for the International Criminal Police
Organization (INTERPOL)*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

      A.     The International Organizations Immunity Act of 1945..............................3

      B.     INTERPOL .................................................................................................4

      C.     Factual Allegations .....................................................................................7

      D.     Procedural History ......................................................................................9

ARGUMENT ...................................................................................................................11

I.      The Court Lacks Subject Matter Jurisdiction Because INTERPOL Is Immune from Suit Under the IOIA. ................................................................................12

II.     The Court Lacks Personal Jurisdiction Over INTERPOL in this Action. ........16

      A.     The Fifth Amendment's Due Process Clause does not permit INTERPOL to be Subjected to General or Specific Personal Jurisdiction. ...............17

      B.     Plaintiff's Inadequate Service Deprives the Court of Personal Jurisdiction..........21

III.    The Complaint Fails to State a Claim Against INTERPOL. .............................24

      A.     Plaintiff's claim based on the INTERPOL Constitution is nonjusticiable, and in any event the Constitution does not confer individually enforceable rights. ......................................................................................................25

      B.     The Complaint's Allegations Establish as a Matter of Law That INTERPOL Did Not Violate the Anti-Terrorism Act. ............................29

IV.    CONCLUSION ...................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Abhe & Svoboda, Inc. v. Chao*,
   508 F.3d 1052 (D.C. Cir. 2007) ........................................................................5, 12

*The Head Money Cases*,
   112 U.S. 580, 598 (1884) ......................................................................................27

*Al-Bihani v. Obama*,
   619 F.3d 1 (D.C. Cir. 2010) ..................................................................................28

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022) ..........................................................................17, 19

*BNSF Ry. Co. v. Tyrrell*,
   581 U.S. 402 (2017) ...............................................................................................17

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) ................................................................................32

*Canadian Transp. Co. v. United States*,
   663 F.2d 1081 (D.C. Cir. 1980) ............................................................................27

*Cannon v. District of Columbia*,
   717 F.3d 200 (D.C. Cir. 2013) ..............................................................................14

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ...............................................................................................26

*Crane v. New York Zoological Soc'y*,
   894 F.2d 454 (D.C. Cir. 1990) ..............................................................................17

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) .....................................................................................17, 18, 19

*Djordjevich v. Bundesminister Finanzen, Germany*,
   124 F.3d 1309 (D.C. Cir. 1997) (unpublished) ....................................................17

*El Omari v. Int'l Crim. Police Org.*,
   No. 19CV1457, 2021 WL 1924183 (E.D.N.Y. May 13, 2021) ..............................5

*El Omari v. Int'l Crim. Police Org.*,
   35 F.4th 83 (2d Cir. 2022) ........................................................................... passim

*Fakhimi v. Dep't of State*,
   No. CV 23-1127 (CKK), 2023 WL 6976073 (D.D.C. Oct. 23, 2023)................5, 12

ii

*Georges v. United Nations*,
    84 F. Supp. 3d 246 (S.D.N.Y. 2015)...................................................................23, 24

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ................................................................................31

*Holmes v. Laird*,
    459 F.2d 1211 (D.C. Cir. 1972) .......................................................................25, 26

*Jam v. Int'l Fin. Corp.*,
    139 S. Ct. 759 (2019).......................................................................................4, 12

*Jerez v. Republic of Cuba*,
    775 F.3d 419 (D.C. Cir. 2014) ...........................................................................15

*Estate of Klieman by & through Kesner v. Palestinian Auth.*,
    923 F.3d 1115 (D.C. Cir. 2019) ........................................................................18

*Kumar v. Republic of Sudan*,
    880 F.3d 144 (4th Cir. 2018) .............................................................................23

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)...............................................................................32

*Medellin v. Texas*,
    552 U.S. 491 (2008)......................................................................................27, 28

*Mora v. New York*,
    524 F.3d 183 (2d Cir. 2008)...........................................................................27, 28

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ...............................................................................17

*NAACP v. United States Postal Serv.*,
    496 F. Supp. 3d 1 (D.D.C. 2020) .........................................................................5

*Nix El v. Williams*,
    174 F. Supp. 3d 87 (D.D.C. 2016) ......................................................................30

*Pharm. Rsch. & Manufacturers of Am. v. HHS*,
    43 F. Supp. 3d 28 (D.D.C. 2014) .......................................................................14

*Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*,
    415 F. Supp. 3d 113 (D.D.C. 2019) ....................................................................30

*Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries*,
    353 F.3d 916 (11th Cir. 2003) ...........................................................................24

*Republic of Sudan v. Harrison*,
    139 S. Ct. 1048 (2019)..............................................................................23

*Robinson v. Pilgram*,
    No. CV 20-2965 (GMH), 2021 WL 5987016 (D.D.C. Dec. 17, 2021)....................32

*Rusesabagina v. Republic of Rwanda*,
    652 F. Supp. 3d 1 (D.D.C. 2023).................................................................15

*Sami v. United States*,
    617 F.2d 755 (D.C. Cir. 1979)..............................................................19, 21

*Sampaio v. Inter-Am. Dev. Bank*,
    806 F. Supp. 2d 238 (D.D.C. 2011)...........................................................16

*Schieber v. United States*,
    77 F.4th 806 (D.C. Cir. 2023)...................................................................25

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005)..................................................................26

*Steinberg v. International Criminal Police Organization*,
    672 F.2d 927 (D.C. Cir. 1981)..................................................................21

*Tachiona v. United States*,
    386 F.3d 205 (2d Cir. 2004).....................................................................23

*United States v. Li*,
    206 F.3d 56 (1st Cir. 2000)......................................................................28

*Walden v. Fiore*,
    571 U.S. 277 (2014)......................................................................19, 20, 21

*Widerspan v. Republic of Cuba*,
    246 F. Supp. 3d 873 (S.D.N.Y. 2017).........................................................14

*Zuza v. Off. of High Representative*,
    107 F. Supp. 3d 90 (D.D.C. 2015)........................................................12, 16

**FEDERAL STATUTES**

18 U.S.C. § 2331................................................................................29, 30, 31, 32

Anti-Terrorism Act, 18 U.S.C. § 2333................................................................ passim

18 U.S.C. § 2339A........................................................................................9, 31

22 U.S.C. § 228a...............................................................................................11

22 U.S.C. § 263a ...................................................................................................13

International Organization Immunities Act, 22 U.S.C. § 288 *et seq*. ................... passim

22 U.S.C. § 288a ............................................................................................1, 4, 12

22 U.S.C. § 2371 ...................................................................................................15

22 U.S.C. § 2780 ...................................................................................................15

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq*.........................4, 12, 13, 16

28 U.S.C. § 1604 ................................................................................................4, 12

28 U.S.C. § 1605 ............................................................................4, 12, 13, 15, 16

28 U.S.C. § 1605A .......................................................................................13, 14, 15

50 U.S.C. § 4813(c) ...............................................................................................15

National Defense Authorization Act of 2019, § 1754(c), Pub. L. 115-232, Stat. 1636 (2018) ..................................................................................................15

Pub. L. No. 587, 52 Stat. 640 (1938) .....................................................................13

## FEDERAL RULES

Fed. R. Evid. 201 ................................................................................................5, 14

Fed. R. Civ. P. 4 ............................................................................................... passim

Fed. R. Civ. P. 12 ............................................................................................. passim

## FEDERAL REGULATIONS

28 C.F.R. § 0.34 ...............................................................................................5, 18

## EXECUTIVE ORDERS

E.O. 12,425 ...........................................................................................................13

E.O. 12,971 ...........................................................................................................13

E.O. 13,524 ...........................................................................................................13

## CONSTITUTIONAL PROVISIONS

Fifth Amendment ............................................................................................. passim

**LEGISLATIVE MATERIALS**

S. Rep. No. 79-861 (1945) ............................................................................................................3

**OTHER AUTHORITY**

1958 Const. art. 55 (Fr.), *available at*
    https://www.refworld.org/docid/3ae6b594b.html (last visited Dec. 6, 2023) ........................23

## INTRODUCTION

INTERPOL is an international organization headquartered in France, whose members consist of the United States and 195 other countries.  Its mandate is to promote international police cooperation by facilitating mutual assistance among criminal police authorities in its member countries.  INTERPOL is a "public international organization" within the meaning of the International Organization Immunities Act (IOIA), 22 U.S.C. § 288 *et seq.  See El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 91 (2d Cir. 2022) (holding that INTERPOL is a public international organization entitled to the protections of the IOIA).  As a result, INTERPOL is entitled to the same presumptive immunity from suit that foreign sovereigns enjoy in U.S. courts.  22 U.S.C. § 288a(b).

In this action, Plaintiff alleges that he was wrongly detained by the United Arab Emirates (UAE) at the behest of Egypt for his criticism of the Egyptian government, and that he was initially told by UAE officials that his detention was triggered by an INTERPOL "red notice"—an alert that INTERPOL publishes at the request of one member country to alert other member countries that a particular individual is wanted by law enforcement in the requesting country.  Plaintiff concedes that upon his subsequent inquiry, the Commission for the Control of INTERPOL's Files (CCF), an independent, quasi-judicial body that responds to inquiries from individuals about INTERPOL notices, informed him that there is no data in INTERPOL's system pertaining to him; that INTERPOL made public statements to the same effect; and Plaintiff was subsequently told the basis of his arrest was a red notice issued by the Arab Interior Ministers Council (AIMC).  Nonetheless, Plaintiff alleges on these facts that INTERPOL committed acts of international terrorism within the meaning of the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, and also violated its own Constitution.

1

Plaintiff's Complaint must be dismissed for several independent reasons. *First*, under the IOIA, INTERPOL is entitled to statutory immunity from Plaintiff's claims. The IOIA exists to shield INTERPOL and other international organizations from suits that would interfere with the organization's core activities. Based on the allegation that the Plaintiff says he was told there was an INTERPOL red notice (even though he was later told that the basis of his arrest was a red notice issued by AIMC), Plaintiff seeks compensatory and punitive damages and an injunction against INTERPOL issuing any red notice against Plaintiff in the future. If INTERPOL were subject to suit in the national courts of its 196 member countries based on the thousands of notices it has published for fugitives based on such allegations, it would not be able to function in the manner that the United States and other member countries contemplated. INTERPOL's Constitution—its governing document—therefore establishes the CCF to furnish an independent expert review mechanism to provide, as appropriate, remedies to individuals who are the subject of data within INTERPOL's system (including corrective actions and other appropriate remedies).

*Second*, the allegations in the Complaint establish as a matter of law that the Court lacks personal jurisdiction over INTERPOL. INTERPOL is headquartered in and operates in France, and Plaintiff does not allege that INTERPOL took any actions in the United States related to this suit. As a result, the Due Process Clause of the Fifth Amendment forecloses exercising personal jurisdiction over INTERPOL. In addition, personal jurisdiction is lacking because Plaintiff has not adequately served INTERPOL.

*Third*, the Complaint fails to state a claim against INTERPOL upon which relief can be granted. Plaintiff's first cause of action seeks to enforce INTERPOL's Constitution as a matter of federal law, but that claim raises a nonjusticiable political question, and also fails because the INTERPOL Constitution does not create individually enforceable rights. Plaintiff's second and

third causes of action allege violations of the ATA, but the Complaint's allegations establish as a matter of law that INTERPOL has not committed any act of "international terrorism," as that statute requires.

*     *     *

INTERPOL respectfully observes that it is appearing in this action for the limited purpose of filing this motion to dismiss, even though INTERPOL has not been adequately served.  For the reasons explained below, not only is any purported service on INTERPOL legally ineffective; there is also substantial doubt whether *any* purported service has been accomplished in the first place.  Nonetheless, because INTERPOL believes that it is clearly immune from this suit, and that Plaintiff's claims against INTERPOL also must be dismissed for the additional reasons discussed herein, INTERPOL has concluded that the most efficient and expeditious course of action is to make a limited appearance for the purpose of seeking dismissal.  INTERPOL does not thereby waive any of its immunities.  INTERPOL respectfully requests that the Court dismiss Plaintiff's claims against it with prejudice.

## **BACKGROUND**

### A.    **The International Organizations Immunity Act of 1945**

Congress enacted the IOIA in 1945, in response to the creation of multilateral organizations that were composed of the United States and its allies, and that were charged with fostering international cooperation in the aftermath of World War II.  S. Rep. No. 79-861, at 2 (1945).  The United States understood that because international organizations are composed of, and receive contributions from, their member states, they should "clearly not [be] subject to the jurisdiction or control of any one of them."  Anders Decl., Ex. A (Report of the Secretary of State, Chairman of the U.S. Delegation to the San Francisco Conference, to the President of the United States, at 159).

3

The IOIA provides immunity to "public international organization[s]" in which the United States participates pursuant to treaty or statute, and which are designated by the President as entitled to the IOIA's protections.  22 U.S.C. § 288.  International organizations entitled to the statute's protections "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."  22 U.S.C. § 288a(b).  In *Jam v. International Finance Corp.*, the Supreme Court construed Section 288a(b) "to make international organization immunity and foreign sovereign immunity continuously equivalent."  139 S. Ct. 759, 768 (2019).  Because foreign sovereign immunity is now governed by the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602 *et seq*., the scope of international organizations' immunity from suit is also governed by the FSIA.  *Jam*, 139 S. Ct. at 772.  The FSIA provides in Section 1604 that foreign states "shall be immune from the jurisdiction of the courts of the United States and of the States," subject to exceptions enumerated in Section 1605.  28 U.S.C. §§ 1604, 1605.

### B.    INTERPOL

INTERPOL is an international organization in which the United States is a member.  For the reasons discussed further below, INTERPOL is a public international organization within the meaning of the IOIA.  *See* p. 13, *infra*.  INTERPOL's mandate, set forth in its Constitution, is "[t]o ensure and promote the widest possible mutual assistance between all criminal police authorities within the limits of the laws existing in the different countries and in the spirit of the 'Universal Declaration of Human Rights,'" and "[t]o establish and develop all institutions likely to contribute effectively to the prevention and suppression of ordinary law crimes."  Anders Decl., Ex. B (INTERPOL Constitution), art. 2.[1]  INTERPOL thus supports its member countries' efforts in

---

[1] Plaintiff's Complaint relies heavily on INTERPOL's Constitution, including by alleging that the Constitution creates individual rights that Plaintiff may enforce in U.S. courts.  *See, e.g*., Dkt. 1 ¶¶ 140-51.  The Constitution is thus incorporated into the complaint, and it is also a relevant, public legal authority that the Court may consider.  *See Fakhimi v. Dep't of State*, No. CV 23-1127 (CKK),

combating crime, including by maintaining international police databases with information on crimes and criminals.  Anders Decl., Ex. C (What is INTERPOL?).[2]  INTERPOL is not an "operational law enforcement organization along the lines of the FBI"; instead, its "function is simply to facilitate communications between the various domestic police agencies in its 194 [now 196] participating countries."  *El Omari*, 35 F.4th at 85.

Pursuant to INTERPOL's Constitution, INTERPOL is governed by a General Assembly, a body of member countries in which each member country is accorded a vote.  Anders Decl., Ex. B, art. 6, 7, 13, 14.  Each member country "may delegate as a Member to the Organization any official police body whose functions come within the framework of activities of the Organization." Anders Decl., Ex. B, art. 4.  Thus, each member country has an INTERPOL National Central Bureau (NCB) that serves as the country's official representative to INTERPOL.  For instance, the United States' NCB, established in 1968, is INTERPOL Washington, which operates under the joint supervision of the Department of Justice and the Department of Homeland Security.  28 C.F.R. § 0.34 (listing NCB functions).

One of INTERPOL's primary means of providing mutual assistance among member countries' law enforcement agencies is its system of color-coded notices.  The General Assembly has, by vote of the member countries in accordance with Article 8(d) of the Constitution, adopted the Rules on the Processing of Data to govern the notices system.  Anders Decl. Ex. D (Rules on

---

2023 WL 6976073, at *3 (D.D.C. Oct. 23, 2023); *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059-60 (D.C. Cir. 2007); *see generally El Omari v. Int'l Crim. Police Org.*, No. 19CV1457, 2021 WL 1924183 (E.D.N.Y. May 13, 2021) (considering INTERPOL's governing documents in deciding motion to dismiss).

[2] The Court may take judicial notice of information on the public websites of government agencies and international organizations that is not subject to reasonable dispute.  *NAACP v. United States Postal Serv.*, 496 F. Supp. 3d 1, 6 n.1 (D.D.C. 2020) (taking judicial notice of information on website of World Health Organization, an international organization); Fed. R. Evid. 201(b)(2).

the Processing of Data).  Pursuant to the Rules on the Processing of Data, INTERPOL facilitates communication among law enforcement agencies, including through notices, provided certain criteria are met and the notices comply with INTERPOL's legal framework, including the Rules on Processing Data and INTERPOL's Constitution.  *See generally id*.  At issue in this case is an allegation that Plaintiff was initially told there was an INTERPOL red notice pertaining to Plaintiff published by INTERPOL (despite contrary facts provided in the Complaint alleging that INTERPOL did not publish a red notice).  Red notices generally are published to seek the location of a person wanted within a member country.  *Id.*, art. 82.  INTERPOL cannot compel any country to arrest an individual who is subject to a red notice.  Anders Decl., Ex. E (About Red Notices). Each member country decides what legal value to give a red notice and what action will be taken by its law enforcement authorities.  *Id*.; Anders Decl., Ex. D, art. 87.

INTERPOL's Constitution establishes the CCF as an independent, quasi-judicial body responsible for, among other things, reviewing requests by individuals to access, correct, or delete data—such as red notices—processed in its information system.  Anders Decl., Ex. B, art. 36.  The CCF's operation is governed by INTERPOL's Constitution and the Statute of the Commission for the Control of INTERPOL's Files (the CCF Statute).  Anders Decl., Ex. F (the CCF Statute). Under the CCF statute, the CCF "shall have exclusive power to . . . examine and decide on requests for access to, or correction and/or deletion of, data processed in the INTERPOL information system," including red notices.  *Id*., art. 28.  "Any person or entity" has the "right to submit directly to the [CCF] a request for access to, or correction and/or deletion of," a notice "concerning that person or entity."  *Id*., art. 29.  If the CCF finds that data has not been processed in accordance with INTERPOL's legal framework, the CCF may decide on corrective actions and other appropriate remedies.  *Id*., art. 39.  The CCF's decisions, including decisions that the issuance of

a red notice does not comply with INTERPOL's rules or Constitution, are "final and binding." *Id.*, art. 38.

### C.      Factual Allegations

This case arises from the UAE's alleged arrest and detention of Plaintiff Sherif Osman for criticizing the Egyptian government. The defendants are the states of Egypt and the UAE; the President of Egypt; certain UAE officials; several John Doe defendants who are Egyptian Intelligence Officers and UAE police officers; AIMC, a regional body coordinating cooperation in criminal matters among Arab countries[3]; and INTERPOL. The alleged facts set forth below are taken from the Complaint.

The Complaint alleges that in 2022, Plaintiff, a citizen and resident of the United States, posted a video calling for protests of the Egyptian government's climate and human rights policies. Dkt. 1 ¶¶ 92, 95. On November 2, 2022, Plaintiff traveled from Boston to Dubai, UAE, with a layover in Amsterdam. Dkt. 1 ¶ 100, 101. During the layover in Amsterdam, Plaintiff notes that he was never stopped, questioned, detained, or notified of an INTERPOL red notice (even though the Netherlands is a member country of INTERPOL). Dkt. 1 ¶ 101; Anders Decl., Ex. H (INTERPOL Member Countries). On November 6, 2022, Plaintiff was allegedly arrested in Dubai by plainclothes officers and briefly detained in a "Dubai police building." Dkt. 1 ¶¶ 103, 105, 106.

The Complaint's allegations concerning INTERPOL are sparse. Plaintiff asserts that the room in which he was held in the Dubai police building was marked "Interpol Headquarters" on the door, and "one wall had a large Interpol logo." Dkt. 1 ¶ 106. Plaintiff does not allege that he met with any INTERPOL personnel or that any INTERPOL personnel were involved in his detention. Rather, during his detention, Plaintiff met with Defendant Ismail Madani, allegedly a

---

[3] Anders Decl., Ex. G (Arab Ministers Interior Council).

"public prosecutor for Dubai's prosecution office" who Plaintiff alleges also serves as a liaison to INTERPOL.  Dkt. 1 ¶ 23, 109.  Madani allegedly told Plaintiff that "his arrest was based on an Interpol Red Notice issued at Defendant Egypt's request," relating to an open criminal case involving Plaintiff's conduct in Egypt in 2019.  Dkt. 1 ¶ 110.  Plaintiff alleges that Madani subsequently told a U.S. official at the U.S. Consulate in Dubai that Plaintiff was subject to an INTERPOL red notice.  Dkt. 1 ¶ 116.

Plaintiff alleges that two weeks later, on November 28, 2022, INTERPOL's press office publicly stated that there was no red notice for Plaintiff.  Dkt. 1 ¶ 118.  Shortly thereafter, Plaintiff alleges, "UAE officials" told U.S. officials that Plaintiff had been arrested pursuant to an AIMC red notice.  Dkt. 1 ¶ 119.

The Complaint alleges that INTERPOL and AIMC "colluded to shift the purported justification for Plaintiff Osman's imprisonment from an Interpol Red Notice to an AIMC Red Notice."  Dkt. 1 ¶ 120.  The Complaint alleges that this "collu[sion]" occurred "at a virtual meeting" but otherwise contains no factual allegations supporting the assertion of collusion.  Dkt. 1 ¶ 121.

Plaintiff asserts that on March 23, 2023, INTERPOL's CCF confirmed that INTERPOL had no record of a red notice concerning Plaintiff.  Dkt. 1 ¶ 119 n.89.  Plaintiff alleges that a red notice may have issued but may have been subsequently deleted.  *Id.*

According to the Complaint, the UAE detained Plaintiff until December 22, 2022, when Plaintiff was released rather than extradited to Egypt.  Dkt. 1 ¶ 125.  Plaintiff alleges that he feared torture or death if extradited to Egypt.  *Id.*

On the basis of these allegations, the Complaint seeks several forms of relief.  In his First Cause of Action, Plaintiff seeks declaratory judgment against INTERPOL pursuant to INTERPOL's Constitution.  Article 3 of that Constitution states that it is "strictly forbidden" for

INTERPOL to "undertake any intervention or activities of a political, military, religious or racial character." Dkt. 1 ¶ 141.  Plaintiff seeks a declaratory judgment that INTERPOL violated its own Constitution and an injunction barring INTERPOL from issuing future red notices against Plaintiff at Egypt's request.  Dkt. 1 ¶ Prayer for Relief A, B.

In the Second and Third Causes of Action, Plaintiff seeks compensatory and punitive damages under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333(a).  In the Second Cause of Action, Plaintiff asserts that INTERPOL's alleged conduct constituted an act of "international terrorism" that would be criminal had it occurred in the United States, thereby giving rise to a civil claim for damages under the ATA.  In the Third Cause of Action, Plaintiff asserts that INTERPOL committed an act of "international terrorism" by providing material support to terrorist activities within the meaning of 18 U.S.C. § 2339A.  Specifically, Plaintiff asserts that INTERPOL and AIMC "provided their Red Notice services to locate Plaintiff Osman and their personnel to process and prosecute Plaintiff Osman and facilities to detain Plaintiff Osman." Dkt. 1 ¶ 160(a).  As noted above, however, Plaintiff alleges only that UAE personnel were involved in his detention; he does not allege that he interacted with any INTERPOL personnel while he was in the UAE.  Based on this allegation, Plaintiff asserts that INTERPOL "knew or recklessly disregarded that the material support and resources that they provided to Defendant Egypt were used in preparation for Egypt attempting" to commit certain offenses against Plaintiff.  Dkt. 1 ¶ 161.

### D.    Procedural History

On July 20, 2023, Plaintiff filed this action.  On September 13, 2023, Plaintiff requested that the Clerk of Court serve INTERPOL pursuant to Federal Rule of Civil Procedure 4(f), which pertains to serving an individual outside the United States.  Dkt. 15.

On October 3, 2023, the Clerk filed a Certificate certifying that the Clerk "dispatched for mailing" one copy of the summons and complaint by FedEx "to the individual of the foreign state,

pursuant to the provisions of FRCP 4(f)(2)(C)(ii)."  Dkt. 18.  Rule 4(f)(2)(C)(ii) states that an

"individual in a foreign country" may be served, if there is no "internationally agreed means" for

service, "using any form of mail that the clerk addresses and sends to the individual and that

requires a signed receipt," "unless prohibited by the foreign country's law."  Fed. R. Civ. P.

4(f)(2)(C)(ii).  Attached to the Certificate were two FedEx waybills, one addressed to AIMC and

one addressed to INTERPOL at its headquarters in Lyon, France.  Dkt. 18.

On October 6, 2023, INTERPOL received by FedEx a package from the Clerk of this Court.

That package included a request for waiver of service directed to INTERPOL and signed by

Plaintiff's counsel, and attached to this request was a copy of the summons and complaint.  Anders

Decl. ¶ 2.  The request to waive service states that it is not a summons, and requests that

INTERPOL waive formal service of the summons within 90 days from the date shown on the

waiver form (September 29, 2023).  *Id*.  INTERPOL has not waived formal service, and will not

do so.

The request for waiver of formal service, and the provision of 90 days in which to do so,

is inconsistent with any assertion that the FedEx package itself constituted adequate service of the

summons and complaint.  Plaintiff also has not filed any proof of service on the docket, as would

be required by Rule 4(*l*) if Plaintiff believed he had effectuated service.  The October waiver

request did not constitute service on INTERPOL, and the Plaintiff does not assert otherwise.

On November 28, 2023, a member of the French National Police approached security

officers at INTERPOL's headquarters in Lyon.  According to security, the French National Police

officer was there to serve a document that seemed to be a complaint lodged by an individual named

"Sheriff Ousmane."  Anders Decl. ¶ 3.  No further information was provided to the security officers

as the police officer was told only to serve INTERPOL.  The security officers did not accept the

document.  *Id*.  This event may be related to Document No. 21 on the docket, which (although titled as an "Affidavit Requesting Foreign Mailing") states that Plaintiff mailed the summons and complaint to the French Ministry of Justice "pursuant to the Convention on The Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 15 November 1965." Dkt. 21 at 1.  That appears to be a reference to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.  *See* Fed. R. Civ. P. 4(f)(1).  INTERPOL, as an international organization, is not a signatory of the Hague Convention.

Because neither the October communication nor the November service attempt constituted adequate service, and because INTERPOL is immune from legal process, INTERPOL's position is that it has not been served and that it is not currently subject to any deadline to respond to the Complaint.  But in an abundance of caution, INTERPOL is appearing now (within 21 days of the November 28 service attempt, *see* Fed. R. Civ. P. 12(a)(1)(A)) for the limited purpose of seeking dismissal of INTERPOL from this case.  INTERPOL does not thereby waive any of its immunities.

## **ARGUMENT**

For multiple independent reasons, the Complaint must be dismissed as to INTERPOL. *First*, as an officially designated international organization in the United States, INTERPOL is immune from this suit under the IOIA, *see* 22 U.S.C. § 288a(b), and the Complaint must therefore be dismissed as to INTERPOL under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  *Second*, this Court lacks personal jurisdiction over INTERPOL because such jurisdiction cannot be exercised consistent with the Due Process Clause, and Plaintiff has failed to properly serve INTERPOL.  The Complaint therefore must be dismissed under Rule 12(b)(2).  *Third*, although this Court need not reach the sufficiency of Plaintiff's allegations, the Complaint should be dismissed under Rule 12(b)(6) for failure to state claims against INTERPOL upon which relief can be granted.

When considering a motion to dismiss under Rule 12, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint" or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Fakhimi v. Dep't of State*, No. CV 23-1127 (CKK), 2023 WL 6976073, at *3 (D.D.C. Oct. 23, 2023) (internal citations and quotation marks omitted).  The Court may also consider documents in the public record of which the Court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## I.   The Court Lacks Subject Matter Jurisdiction Because INTERPOL Is Immune from Suit Under the IOIA.

INTERPOL, as an international organization within the meaning of the IOIA, is entitled to the "same" immunity from suit as the FSIA confers on foreign sovereigns.  22 U.S.C. § 288a(b); *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019) (international organizations' immunity from suit is governed by the FSIA); *El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 85 (2d Cir. 2022) (holding that INTERPOL is an international organization entitled to immunity under the IOIA). Under Section 1604 of the FSIA, foreign states, and thus international organizations such as INTERPOL, "are presumptively immune from suit," unless one of Section 1605's "statutory exceptions" to immunity applies. *Jam*, 139 S. Ct. at 766; 28 U.S.C. § 1605.  Because Plaintiff has failed to allege that any of the FSIA's exceptions to immunity apply to his claims against INTERPOL—and because none can apply as a matter of law—INTERPOL is immune from this suit.   This Court therefore lacks subject matter jurisdiction over Plaintiff's claims against INTERPOL.  *See Zuza v. Off. of High Representative*, 107 F. Supp. 3d 90, 93 (D.D.C. 2015) (collecting cases).

1.      INTERPOL satisfies all of the IOIA's threshold criteria for entitlement to immunity. Under the IOIA, an international organization is entitled to immunity if it is "[1] a public international organization [2] in which the United States participates pursuant to any treaty or under the authority of any Act of Congress . . . and [3] which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in this subchapter."  22 U.S.C. § 288.  First, INTERPOL is a "public international organization" because it is "a coordinated product of states and governments acting to serve their public interest"—that is, its mission is to foster international cooperation among member countries' police agencies. *El Omari*, 35 F.4th at 88 (holding that INTERPOL is a "public international organization").  Second, the United States has been a member of INTERPOL since 1938, pursuant to express authorization contained in an Act of Congress.  22 U.S.C. § 263a; *see* An Act to authorize membership on behalf of the United States in the International Criminal Police Commission, Pub. L. No. 587, 52 Stat. 640 (1938) (codified as amended at 22 U.S.C. § 263a); *see also* Department of Justice Appropriation Authorization Act, Fiscal Year 1979, Pub. L. No. 95-624 § 21(a), 92 Stat. 3459 (codified at 22 U.S.C. § 263a).  Third, in 1983, "President Reagan issued an Executive Order designating Interpol as an organization entitled to certain immunities and privileges under the IOIA," and subsequent presidents issued additional executive orders broadening INTERPOL's immunity to the full extent provided by the IOIA.  *El Omari*, 35 F.4th at 85, 87; Anders Decl. Exs. I (E.O. 12,425), J (E.O. 12,971), K (E.O. 13,524).  INTERPOL thus plainly meets the statutory criteria for immunity under the IOIA, and the Complaint does not allege otherwise.

2.      INTERPOL is entitled to immunity from this suit under the IOIA and FSIA. Plaintiff does not allege that any of the exceptions to immunity set forth in Section 1605 of the

13

FSIA applies to INTERPOL.  Dkt. 1 ¶¶ 28-29 (jurisdictional allegations).  That failure itself warrants dismissing the Complaint.  In all events, as a matter of law Plaintiff's claims do not fall within any of the FSIA's exceptions to immunity.

*First*, although Plaintiff alleges that the court has jurisdiction "over *Defendants Egypt and UAE* under 28 U.S.C. § 1605A(a)(1)," Dkt. 1 ¶ 28 (emphasis added), Plaintiff does not suggest that Section 1605A applies to INTERPOL.  Even if he had, that exception to immunity cannot apply to INTERPOL.  Section 1605A(a)(1) abrogates immunity only of a "foreign state" that "was designated as a state sponsor of terrorism at the time the act [of terrorism complained of] occurred." 28 U.S.C. § 1605A(a)(2).  *See, e.g., Widerspan v. Republic of Cuba*, 246 F. Supp. 3d 873, 878 (S.D.N.Y. 2017) ("Section 1605A waives sovereign immunity only as to terroristic acts committed after a sovereign was designated as a state sponsor of terror or that were the cause for the designation.").  INTERPOL has not been designated a state sponsor of terrorism (and neither has Egypt or the UAE).  *See* Anders Decl., Ex. L (U.S. Department of State, *State Sponsors of Terrorism*) (listing Cuba, North Korea, Iran, and Syria as the only four nations that have been designated state sponsors of terrorism).[4]

Indeed, INTERPOL is not *legally eligible* to be designated a state sponsor of terrorism, because the Secretary of State's authority to designate state sponsors of terrorism extends only to foreign *countries*.  *See* 28 U.S.C. §1605A(h)(6) (for purposes of Section 1605A(a)(2), a "state sponsor of terrorism" is a country "the government of which the Secretary of State has determined,

---

[4] Pursuant to Federal Rule of Evidence 201, this Court may take judicial notice of information posted on public government websites. See, e.g., *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of District of Columbia Retirement Board website); *Pharm. Rsch. & Manufacturers of Am. v. HHS*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

for purposes of [enumerated statutes] or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism."). The statutes pursuant to which the Secretary of State may designate state sponsors of terrorism leave no doubt on that score. *See, e.g.,* 22 U.S.C. § 2371(a) (providing for designation "if the Secretary of State determines that the *government of that country* has repeatedly provided support for acts of international terrorism.") (emphasis added); 50 U.S.C. § 4813(c) (providing for such designation "if the Secretary of State has made the following determinations: (i) The *government of such country* has repeatedly provided support for acts of international terrorism.") (emphasis added); 22 U.S.C. § 2780(d) ("The prohibitions contained in this section apply with respect to a country if the Secretary of State determines that the *government of that country* has repeatedly provided support for acts of international terrorism.") (emphasis added); National Defense Authorization Act of 2019, § 1754(c), Pub. L. 115-232, 132 Stat. 1636 (2018) (same). Section 1605A's exception to immunity for certain claims against state sponsors of terrorism therefore cannot as a matter of law apply to claims against INTERPOL.

*Second*, although Plaintiff's claims might be characterized as tort claims, Section 1605(a)(5)'s tort exception cannot apply here. That exception encompasses only claims "for personal injury or death, or damage to or loss of property, *occurring in the United States* and caused by the tortious act or omission" of the international organization. 28 U.S.C. § 1605(a)(5) (emphasis added). The tort exception thus applies "only if every element of the tort, including both the wrongful act and the resulting injury, occurred entirely in the United States." *Rusesabagina v. Republic of Rwanda*, 652 F. Supp. 3d 1, 8 (D.D.C. 2023); *accord Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014). Here, Plaintiff alleges that his injuries occurred in Dubai, where he was improperly detained—not in the United States. Dkt. 1 ¶ 3, 102-106, 111,

125, 130.  That in itself is sufficient to foreclose application of the tort exception.  In addition, all of the Complaint's allegations mentioning INTERPOL concern conduct that occurred outside the United States.  Dkt. 1 ¶¶ 106 (alleging that Plaintiff was held in Dubai in a room "marked Interpol Headquarters" with an "Interpol logo"); 116 (alleging that Plaintiff was told that INTERPOL had issued a Red Notice for Plaintiff); 16 (alleging that INTERPOL is headquartered in France). Because the Complaint's allegations establish that both the alleged injury and any alleged tort occurred entirely outside the United States, the tort exception cannot apply.

*Third*, no other FSIA exception applies to the Complaint's allegations against INTERPOL. INTERPOL has not waived its immunity.  28 U.S.C. § 1605(a)(1) (exception for waiver).  None of the allegations remotely concern any commercial activity on INTERPOL's part, much less commercial activities undertaken within, or with an effect on, the United States, so the action does not fall within the commercial activity exception.  28 U.S.C. § 1605(a)(2).  And the other exceptions, for property rights, takings, and enforcement of arbitral awards, clearly do not apply. 28 U.S.C. § 1605(a)(3), (4), (6).

Because no exception to immunity under the FSIA applies, the IOIA bars Plaintiff's suit against INTERPOL.  *Zuza*, 107 F. Supp. 3d at 93.  The Court therefore need not reach the issues of personal jurisdiction or the complaint's failure to state a claim.  *See, e.g., Sampaio v. Inter-Am. Dev. Bank*, 806 F. Supp. 2d 238, 243 (D.D.C. 2011), *aff'd* 468 F. App'x 10 (D.C. Cir. 2012) (dismissing claim against defendant with immunity as an international organization for lack of subject matter jurisdiction without reaching defendants' other defenses).

## II.   The Court Lacks Personal Jurisdiction Over INTERPOL in this Action.

Plaintiff alleges personal jurisdiction based on Federal Rule of Civil Procedure 4(k)(2). Dkt. 1 ¶ 29.  That Rule requires the Complaint to allege facts establishing a prima facie showing that, as relevant here, (1) "exercising jurisdiction is consistent with the United States Constitution

and laws,"[5] and (2) INTERPOL has either been adequately served or waived service.  Fed. R. Civ.

P. 4(k)(2); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022); *Djordjevich v. Bundesminister Finanzen, Germany*, 124 F.3d 1309 (D.C. Cir. 1997) (unpublished).

Neither requirement is satisfied here.  The Due Process Clause of the Fifth Amendment does not permit the exercise of general or specific personal jurisdiction over INTERPOL because the allegations in the Complaint establish that INTERPOL has no presence in the United States that could subject it to general jurisdiction, and INTERPOL undertook *no* alleged activities in the United States that could subject it to specific jurisdiction.  In addition, INTERPOL has not waived service, and Plaintiff has not adequately served INTERPOL in this action.  Accordingly, Plaintiff's claims against INTERPOL should be dismissed for lack of personal jurisdiction.  *See Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

### A. The Fifth Amendment's Due Process Clause does not permit INTERPOL to be Subjected to General or Specific Personal Jurisdiction.

1. *General personal jurisdiction.*  To be subject to general personal jurisdiction in the United States, a foreign entity's "affiliations" with the United States must be "so constant and pervasive as to render it essentially at home in the forum."  *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (alterations accepted).  Generally, an entity is at home in its "place of incorporation and its principal place of business," and the exercise of general jurisdiction other than in those places is "an exceptional case."  *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (quotation marks omitted).  Though INTERPOL is not a foreign corporation, the principles established in *Daimler* nonetheless permit only one conclusion here.  As the Complaint acknowledges,

---

[5] Under Rule 4(k)(2), where a Plaintiff alleges claims under federal law, the defendant's relevant contacts for due process purposes are those with the United States as a whole.  *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005).

INTERPOL is headquartered in, and has its principal place of business in, Lyon, France.  Dkt. 1 ¶ 16.  INTERPOL therefore is not at home in the United States and is not subject to general personal jurisdiction here.  *See Estate of Klieman by & through Kesner v. Palestinian Auth*., 923 F.3d 1115, 1123 (D.C. Cir. 2019) (Palestinian Authority not subject to general jurisdiction where its headquarters and primary operations were outside the United States).

To the extent that Plaintiff attempts to argue that INTERPOL is subject to general jurisdiction in the United States based on the United States' membership in INTERPOL and the existence of the United States National Central Bureau, Dkt. 1 ¶ 16 (emphasizing existence of U.S. National Central Bureau), those arguments are meritless.  The United States' membership in INTERPOL cannot render INTERPOL "at home" in the United States, given that—as the Complaint alleges—INTERPOL is headquartered in and operates in France.  Even if the United States' membership means that INTERPOL has regular contacts with the United States—though the Complaint does not so allege—the Supreme Court has held that such contacts do not suffice to establish general jurisdiction consistent with the Due Process Clause.  *Daimler AG*, 571 U.S. at 138.

With respect to the United States' National Central Bureau (USNCB), although the Complaint describes the USNCB as a "central U.S.-based office for Defendant Interpol," that allegation is wrong as a matter of law.  INTERPOL's Constitution establishes that a "National Central Bureau" is an entity created by an INTERPOL member country as part of *that country's* government or law-enforcement apparatus, to serve as a liaison between the member country and INTERPOL.  Anders Ex. B, art. 32.  Accordingly, the USNCB is a component of the U.S. Department of Justice that acts on behalf of the U.S. Attorney General.  28 C.F.R. § 0.34; Anders Decl. Ex. M (*Memorandum of Understanding Between the U.S. Department of Homeland Security*

*and the U.S. Department of Justice Pertaining to U.S. Membership in the International Criminal Police Organization (INTERPOL), Management of the INTERPOL-U.S. National Central Bureau, and Related Matters*), at 1; *id.*, Ex. N (U.S. Department of Justice, *Organization Mission and Functions Manual: INTERPOL – United States National Central Bureau*).  The USNCB therefore is not an office of INTERPOL and is, as the D.C. Circuit has previously held, not relevant to the general-jurisdiction analysis.  *See Sami v. United States*, 617 F.2d 755, 760 (D.C. Cir. 1979) (the USNCB is an agent of the U.S. government, not INTERPOL), *abrogated on other grounds*, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  And even if the USNCB were an INTERPOL office, it cannot render INTERPOL "at home" in the United States or provide any basis for exercising general personal jurisdiction.  *See Daimler AG*, 571 U.S. at 136-38 (even an in-forum subsidiary is not sufficient to subject a foreign corporation to general jurisdiction).

> b.   ***Specific personal jurisdiction.***  Specific personal jurisdiction is also lacking in this case.  "Pleading specific personal jurisdiction under Rule 4(k)(2) requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's claim." *Bernhardt*, 47 F.4th at 864.  Thus, Plaintiff must demonstrate that INTERPOL "has purposefully directed [its] activities at residents of the forum," and that the alleged injuries "arise out of or relate to those activities."  *Id.* (citation omitted); *accord Walden v. Fiore*, 571 U.S. 277, 284 (2014).  Critically, the "minimum contacts" analysis "looks to the defendant's contacts with the forum State [or, here, the United States] itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285.  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  *Id.* at 286.

The allegations in the Complaint are precisely the sort that the Supreme Court has excluded from specific jurisdiction.  There is no nexus whatsoever between INTERPOL's alleged conduct and the United States.  The Complaint alleges that Plaintiff was initially told that he was arrested based on a red notice that was published by INTERPOL.  (Plaintiff, however, acknowledges that he was informed publicly and by the CCF that there was no data pertaining to him in INTERPOL's system, and that he was subsequently told he was arrested based on an AIMC red notice.  Dkt. 1 ¶¶ 116, 118, 119.)  Plaintiff does not and cannot allege that, even if a red notice had in fact been published by INTERPOL rather than AIMC, it would give rise to a "substantial connection" with the United States.  *Walden*, 571 U.S. at 284.  Rather, the Complaint alleges that Red Notices are "alerts" that are "circulate[d] . . . around the globe on behalf of member countries."  Dkt. 1 ¶ 59. In other words, when INTERPOL publishes a red notice, it does so from outside the United States, and to all 196 member countries, regardless of where the subject of the notice happens to reside or be located at the time.  A red notice is thus not a purposeful or substantial contact with the United States.  Plaintiff's allegation that "Defendant Interpol knows that some of its Red Notices are issued against citizens of the United States," Dkt. 1 ¶ 16, does not alter that conclusion.  As the Supreme Court has explained, "the plaintiff cannot be the only link between the defendant and the forum," and thus the alleged foreseeability that a defendant's out-of-forum actions may affect a plaintiff who resides in the forum cannot in itself serve as the basis for exercising specific jurisdiction.  *Walden*, 571 U.S. at 285, 289 (rejecting Nevada specific personal jurisdiction based on defendant's actions in Georgia that harmed a plaintiff who lived in Nevada).

All of the remaining alleged actions also took place outside the United States.  Plaintiff alleges that the existence of a red notice facilitated Plaintiff's detention by Dubai authorities in the United Arab Emirates.  But even if a red notice had been published by INTERPOL rather than

AIMC, none of the conduct related to Plaintiff's detention is alleged to have occurred in the United States. And the alleged existence of a room marked "Interpol Headquarters" within a Dubai police building—which presumably is the UAE's NCB, as INTERPOL does not have a headquarters in the UAE[6]—is obviously not a contact with the United States. Finally, although Plaintiff alleges that INTERPOL has contacts with the United States as one of its member countries, Dkt. 1 ¶ 65, Plaintiff does not allege that those contacts gave rise to, or even have anything to do with, this suit. As *Walden* made clear, those contacts cannot justify specific jurisdiction: due process requires a substantial connection between the defendant's "*suit-related* conduct" and the forum. 571 U.S. at 284.[7]

### B.     Plaintiff's Inadequate Service Deprives the Court of Personal Jurisdiction.

Plaintiff also cannot satisfy Rule 4(k)(2)'s requirement that the defendant has been adequately served or has waived service. INTERPOL has not waived service. Nor has Plaintiff adequately served INTERPOL. Because INTERPOL enjoys inviolability of its headquarters under

---

[6] Anders Decl., Ex. O (INTERPOL, *Contact INTERPOL*).

[7] Over 40 years ago, in 1981, the D.C. Circuit approved the exercise of specific personal jurisdiction over INTERPOL in a defamation action, pursuant to a provision of the District of Columbia longarm statute, which permitted personal jurisdiction over claims that the defendant "caus[ed] tortious injury in the District of Columbia" where the defendant regularly and persistently does business in the District of Columbia. *Steinberg v. International Criminal Police Organization*, 672 F.2d 927, 931 (D.C. Cir. 1981) (citation omitted); *id.* at 929 (distinguishing *Sami*, *supra*, as involving general, not specific, jurisdiction). *Steinberg* does not support the exercise of personal jurisdiction here, for multiple reasons. First, Plaintiff cannot invoke the D.C. long arm statute because he asserts personal jurisdiction under Rule 4(k)(2), which requires a showing that INTERPOL is not subject to the jurisdiction of the courts of general jurisdiction in the District of Columbia. Fed. R. Civ. P. 4(k)(2). Second, even if Plaintiff could invoke the longarm statute, he could not proceed on a theory that INTERPOL caused tortious injury in the District of Columbia, as he does not allege that he suffered any injury in the District of Columbia. *See* Dkt. 1 ¶ 15, 134-39. Finally, to the extent the *Steinberg* court found that INTERPOL's general, non-suit-related contacts with the United States as one of its member nations were sufficient to support specific jurisdiction, that rationale cannot justify jurisdiction here, and in any event has been abrogated by subsequent Supreme Court decisions, for the reasons stated in the text.

French law, INTERPOL cannot be served by mail or in person without the consent of the Secretary General.  Anders Decl. Ex. P (Headquarters Agreement), art. 4.  INTERPOL has not consented to service here.

1.      As an initial matter, under any of the service methods that may be at issue here, service must comply with French law.  In October 2023, Plaintiff invoked Rule 4(f)(2)(C)(ii), which permits service of an individual outside the United States by mail, "unless prohibited by the foreign country's law"—here, French law (of note, INTERPOL is not an individual).[8]  Plaintiff does not appear to have viewed that mailing as a service attempt.  *See* p. 10, *supra.*  In November, Plaintiff appears to have attempted service under Rule 4(f)(1), which permits service by "internationally agreed" means, including those authorized by the Hague Convention.  *See* pp. 10-11, *supra.*  The Hague Convention provides that a member state may serve a document on persons within its territory "by a method prescribed by its internal law"—here, French law.  *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, *done* Nov. 15, 1965, 20 U.S.T. 363, 685 U.N.T.S. 169, art. 5, 10.  Consistent with the inviolability of INTERPOL's Headquarters and immunity from legal process, INTERPOL's security officers refused to accept service.

Thus, neither communication with INTERPOL resulted in service (or purported service) of the summons and complaint.  But even if INTERPOL had purportedly been served in October

---

[8] Although Rule 4(f) provides a method of service for serving an individual in a foreign country, Rule 4(h) applies those methods to foreign corporations, partnerships, or associations.  INTERPOL is not a foreign corporation, partnership, or association, but rather an intergovernmental organization that is established under international law and entitled to the same immunity from judicial process as foreign states.  INTERPOL therefore does not concede that Rules 4(f) or 4(h) provide the proper means of effecting service on it.  But in all events, the inviolability principles discussed below prohibit service on INTERPOL by any means without its consent.

or November, that service would be invalid because neither method complies with French law for the reasons explained below.

2.     French law prohibits service of INTERPOL by mail or in person without INTERPOL's consent.   INTERPOL's Headquarters Agreement with France provides that INTERPOL's "headquarters shall be inviolable" and that INTERPOL "shall enjoy immunity from legal process," unless INTERPOL "expressly waive[s] its immunity from legal process in certain cases."  Anders Decl. Ex. P, art. 4, 5.  The Headquarters Agreement, which came into effect in 2009 following approval by the French government, is a bilateral agreement that has full effect under French law.  *See id*. Preamble & art. 26; 1958 Const. art. 55 (Fr.), *available at* https://www.refworld.org/docid/3ae6b594b.html (last visited Dec. 6, 2023) (Official English translation: "Treaties or agreements duly ratified or approved shall, upon publication, prevail over Acts of Parliament, subject, in regard to each agreement or treaty, to its application by the other party.").

The inviolability provided by the Headquarters Agreement is a standard of customary international law codified in various treaties and agreements concerning headquarters and diplomatic missions.  Inviolability is widely understood to preclude any entry onto the relevant premises for any government act, including service of process, whether by mail or in person.  *See Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1060 (2019) (explaining United States' position that Vienna Convention's provision for inviolability of diplomatic premises precludes service by mail and in person); *Kumar v. Republic of Sudan*, 880 F.3d 144, 157 (4th Cir. 2018) (same); *Tachiona v. United States*, 386 F.3d 205, 224 (2d Cir. 2004).  For example, in *Georges v. United Nations*, the plaintiffs attempted to serve the United Nations in person without its consent, even though the U.N.'s governing treaty renders the U.N. premises inviolable.  *See* 84 F. Supp. 3d 246,

247 (S.D.N.Y. 2015).   The United States explained in that case that serving the U.N.—like INTERPOL, an international organization—without its consent would violate the principle of inviolability.  *See* Statement of Interest of the United States at 8-9 & Ex. A, *Georges*, No. 13-cv-7146 (S.D.N.Y. Mar. 7, 2014), ECF No. 21.  Although the *Georges* court ultimately did not reach the issue of service, the Eleventh Circuit has recognized that when an international organization enjoys inviolability, it may not be served without consent. *See Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries*, 353 F.3d 916, 923-25 (11th Cir. 2003) (concluding that Austrian law prohibited nonconsensual service because headquarters agreement rendered OPEC inviolable).

Because INTERPOL's Headquarters Agreement provides that its headquarters is inviolable, and because INTERPOL has not consented to service here, it has not been adequately served.

## III.   The Complaint Fails to State a Claim Against INTERPOL.

Although this Court need not reach the adequacy of Plaintiff's allegations for the reasons stated above, if the Court does so, it should hold that each of Plaintiff's claims fails to state a claim against INTERPOL upon which relief could be granted.  Plaintiff's first claim, a declaratory judgment count premised on an alleged violation of the INTERPOL Constitution, presents a nonjusticiable political question, and in any event the INTERPOL Constitution does not create enforceable individual rights.  Plaintiff's second and third claims, brought under the ATA, are based on allegations that as a matter of law cannot establish that INTERPOL committed an "act of international terrorism," as required for liability under the ATA.

**A.      Plaintiff's claim based on the INTERPOL Constitution is nonjusticiable, and in any event the Constitution does not confer individually enforceable rights.**

In his First Cause of Action, Plaintiff seeks a declaratory judgment that INTERPOL violated INTERPOL's Constitution, which provides that INTERPOL will not "undertake any intervention or activities of a political, military, religious or racial character," and that INTERPOL will conduct itself in the spirit of the Universal Declaration of Human Rights.  Dkt. 1 ¶ 141. Plaintiff also asserts that his "rights against arbitrary detention, persecution . . . are derived from Defendant Interpol's Constitution, the Riyadh Arab Agreement for Judicial Cooperation and Arab Convention for the Suppression of Terrorism, as well as from international law."  Dkt. 1 ¶ 149. This Court should dismiss those claims because enforcement of INTERPOL's Constitution is non-justiciable and it does not provide individuals a private right of action.  The CCF Statute, which is an appendix to INTERPOL's Constitution, is the mechanism provided for inquiring into and contesting notices and seeking remedies related to INTERPOL's processing of data.

1.      Plaintiff's request that a United States court enforce INTERPOL's Constitution against INTERPOL presents a nonjusticiable political question.  The D.C. Circuit has held that claims seeking judicial enforcement of an international treaty or agreement against a party to that agreement (or an adjudication of the sovereign parties' respective rights under the agreement) are nonjusticiable where the agreement "specifie[s]" that any rights under the agreement are to be resolved through "nonjudicial" means.  *Holmes v. Laird*, 459 F.2d 1211, 1222 (D.C. Cir. 1972); *accord Schieber v. United States*, 77 F.4th 806, 812 (D.C. Cir. 2023), *petition for cert. filed*, ("courts generally lack authority" to adjudicate sovereign compliance with international agreement, when that agreement specifies nonjudicial means of dispute resolution, whether or not the agreement is self-executing).  Here, INTERPOL's Constitution, adopted through resolution of INTERPOL's member countries, sets forth the member countries' agreement concerning the

purposes and operation of the organization.  Although the Constitution itself does not address mechanisms for resolving disputes concerning INTERPOL's operation, INTERPOL's Rules on the Processing of Data, also adopted by resolution of the member countries, does.  Anders Decl. Ex. D Preamble; Anders Decl. Ex. B, art. 44 *see* pp. 5-6, *supra*.  The Rules on the Processing of Data govern INTERPOL's issuance of red notices, and provide that "[d]isputes that arise in connection with the application of the present Rules should be solved by concerted consultation. If this fails, the matter may be submitted to the Executive Committee and, if necessary, to the General Assembly." *Id.*, art. 135(1).  Moreover, "[a]ll national entities shall be represented in the settlement of disputes by their National Central Bureaus." *Id.*, art. 135(2).

Thus, INTERPOL's member countries have agreed that if any one of them believes that INTERPOL has not complied with its rules, including the provisions of the Constitution on which Plaintiff relies, the member country will resolve that issue through concerted consultation with INTERPOL—not through litigation in any one member country's national courts.  Anders Decl. Ex. B, art. 44 ("The application of this Constitution shall be determined by the General Assembly . . .").  That makes sense: as an organization composed of, and governed by, member countries, matters concerning INTERPOL's operation and compliance with its governing documents should be resolved by agreement among INTERPOL and its member countries.  Efforts to resolve disputes between the United States and INTERPOL or its member countries therefore are fundamentally foreign-affairs endeavors that are textually committed to the political branches, and "belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).  Plaintiff's effort to enforce INTERPOL's Constitution thus raises a nonjusticiable political question.  *Holmes*, 459 F.2d at 1222.

2.      Even if the claim were justiciable, Plaintiff has failed to state a claim for a second, independent reason.  Courts of appeals have uniformly held that treaties and other international agreements presumptively "do not create privately enforceable rights in the absence of express language to the contrary."  *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008); *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980) ("the treaty must be interpreted in accord with the rule that treaty violations are normally to be redressed outside the courtroom"); *Mora v. New York*, 524 F.3d 183, 202 (2d Cir. 2008) ("If contracting States-parties wish to impose upon themselves legal obligations that extend not only to each other, but to all individual foreign nationals, we would ordinarily expect expression of these obligations to be unambiguous."); *accord The Head Money Cases*, 112 U.S. 580, 598 (1884).

INTERPOL's Constitution is an international agreement among INTERPOL's member countries, and it contains no express language creating privately enforceable rights.  For one thing, creating individually enforceable rights against INTERPOL would be irreconcilable with the principle that INTERPOL, as an international organization, is entitled to immunity under international and national law.  Even apart from that, the Articles of the INTERPOL Constitution on which Plaintiff relies relate exclusively to *INTERPOL's* conduct; they do not grant any individual entitlements.  Article 2 states that the "aim" of the Constitution is to promote international law enforcement cooperation "in the spirit of the 'Universal Declaration of Human Rights,'" and Article 3 states that it is "strictly forbidden for the Organization to undertake any intervention or activities of a political, military, religious or racial character."  Anders Decl. Ex. B, arts. 2, 3.  Neither provision says anything about individually enforceable rights or suggests that the thousands of fugitives around the world who might be affected by INTERPOL's mutual-assistance efforts may enforce these provisions directly against INTERPOL in the national courts

of hundreds of member countries.  That silence with respect individual rights establishes that the Constitution does not create them.  *See Mora*, 524 F.3d at 198-202 (provisions that established obligations of member states but did not mention individual rights did not create judicially enforceable rights, especially given that member states could utilize treaty provisions to resolve disputes diplomatically); *United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000) (similar).  Moreover, as described above, the CCF Statue, which is an appendix to INTERPOL's Constitution, provides individuals with an avenue for inquiring into and contesting notices issued against them.  That nonjudicial remedy eliminates any doubt that the Constitution does not establish any individual rights enforceable in court.

3.      Finally, although Plaintiff also invokes in the First Cause of Action the Riyadh Arab Agreement for Judicial Cooperation and Arab Convention for the Suppression of Terrorism, claims based on those authorities appear to be directed at Defendant AIMC, which is also named in the First Cause of Action, and not at INTERPOL.  Dkt. 1 ¶ 147.  In any event, neither agreement can be enforced against INTERPOL.  INTERPOL is not a party to either agreement, and neither is the United States.  Those agreements therefore have not been incorporated into U.S. law and are not "enforceable in federal court."  *Al-Bihani v. Obama*, 619 F.3d 1, 23 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of en banc review) (treaties to which the United States is not a party do not themselves create "domestic law" that is "enforceable in federal court"); *see also Medellín*, 552 U.S. at 505.  The same is true of Plaintiff's general invocation of "international law"; Plaintiff has not identified any specific international-law norms, and "international-law norms that are not incorporated into either a statute or a self-executing treaty . . . do not have the status of domestic U.S. law enforceable in federal courts."  *Al-Bihani*, 619 F.3d at 23 (Kavanaugh, J., concurring in denial of en banc review).

28

**B.  The Complaint's Allegations Establish as a Matter of Law That INTERPOL Did Not Violate the Anti-Terrorism Act.**

In the Second and Third Causes of Action, Plaintiff alleges that INTERPOL committed "acts of international terrorism" under the ATA, 18 U.S.C. § 2333, and provided material support to Defendant Egypt's alleged acts of international terrorism, respectively.  Dkt. 1 ¶¶ 153, 159.  The ATA provides a civil cause of action for "[a]ny national of the United States injured . . . by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  "[I]nternational terrorism" is defined as an activity that (1) "involve[s] violent acts or acts dangerous to human life . . . that would be a criminal violation if committed within the jurisdiction of the United States or of any State;" (2) "appear to be intended . . . to intimidate or coerce a civilian population [or achieve other statutorily-specified aims];" and (3) "occur primarily outside the . . . United States, or transcend national boundaries."  18 U.S.C. § 2331(1).  With respect to both ATA claims, Plaintiff must plausibly allege that INTERPOL engaged in acts of international terrorism.  The actions allegedly taken by INTERPOL do not qualify as acts of international terrorism as a matter of law.

1.  The Second Cause of Action alleges that INTERPOL committed an act of international terrorism against Plaintiff.  Plaintiff's precise theory is not clear.  The Complaint contains the following allegations concerning INTERPOL:  Plaintiff was told that INTERPOL issued a red notice concerning him, but INTERPOL subsequently stated there was no red notice, Dkt. 1 ¶ 119; INTERPOL and AIMC "provided their Red Notice services to locate Plaintiff Osman and their personnel to process and prosecute Plaintiff Osman"; INTERPOL and AIMC "colluded to shift the purported justification" for Plaintiff's detention "from an Interpol Red Notice to an AIMC Red Notice;" and Plaintiff was briefly detained by Dubai Police in a facility that contained an INTERPOL logo.  Dkt. 1 ¶¶ 103, 106, 108, 119 n.89, 120, 160.

As an initial matter, the only allegations of conduct *by INTERPOL* concern INTERPOL's alleged publication of a red notice.  The Complaint does not plausibly allege that INTERPOL personnel were involved in Plaintiff's alleged detention.  Plaintiff's allegations that he was detained by Dubai Police in a room with an INTERPOL logo, and that he communicated with a UAE prosecutor who was also a UAE liaison to INTERPOL, do not assert detention-related conduct by INTERPOL.  And to the extent that the Complaint alleges that INTERPOL provided personnel to "process and prosecute Plaintiff," that allegation must be disregarded as conclusory, as well as contradicted by the Complaint's more specific allegations that the detention was carried out by UAE police and officials, and the fact that INTERPOL, does not have powers to conduct any law enforcement functions like "process[ing]" and "prosecut[ing]" individuals.  *See Precision Contracting Sols., LP v. ANGI Homeservices, Inc*., 415 F. Supp. 3d 113, 124 (D.D.C. 2019).  Moreover, as INTERPOL's Constitution demonstrates, INTERPOL is not an "operational law enforcement organization along the lines of the FBI," and therefore does not have "police" or prosecutorial personnel.  *El Omari*, 35 F.4th at 85; Anders Decl. Ex. B arts. 2, 5, 26, 30, 32.  Finally, Plaintiff's allegations that INTERPOL "colluded" with AIMC must also be disregarded as conclusory.  That allegation is devoid of any factual support in the Complaint and is insufficient as a matter of law.  *See Precision Contracting Sols.*, 415 F. Supp. 3d at 124 (conclusory allegations of malice must be disregarded); *Nix El v. Williams*, 174 F. Supp. 3d 87, 96 (D.D.C. 2016) (dismissing complaint containing conclusory allegations of "collusion").

In all events, *none* of the alleged actions qualifies as an act of "international terrorism" under Section 2331(1)—that is, a "violent act[]" or "act[] dangerous to human life," evidently intended to intimidate or coerce a civilian population or government, and that would be criminal in the United States.  18 U.S.C. § 2331(1).  It should go without saying that INTERPOL's issuance

of notices pursuant to its notice system—established in conjunction with its member countries, including the United States—is not a "violent" act, or an "act dangerous to human life." 18 U.S.C. § 2331(1)(A). Nor are such actions undertaken with apparent intent to coerce or intimidate a civilian population or government, 18 U.S.C. § 2331(B); instead, those actions are ordinary law-enforcement-coordination efforts undertaken to *assist* governments, in furtherance of INTERPOL's mutual-assistance mission as mandated by Article 2 of INTERPOL's Constitution. The other allegations—even if they concerned INTERPOL, and even if they were not disregarded as conclusory—similarly do not describe violent actions intended to intimidate or coerce a civilian population or government. Because the Complaint does not allege that INTERPOL committed any act that could qualify as an act of international terrorism, Plaintiff's second claim does not state a claim against INTERPOL.

2.    Plaintiff's Third Cause of Action against INTERPOL, also for committing an "act of international terrorism" by allegedly providing material support to Egypt, is similarly deficient.

Plaintiff's theory is evidently that INTERPOL engaged in conduct that qualifies as "material support to terrorist activities in violation of 18 U.S.C. § 2339A," and that such alleged material support constitutes an act of "international terrorism under" 18 U.S.C. § 2331 that renders INTERPOL civilly liable under section 2333 of the ATA. Dkt. 1 ¶ 160. Even when a plaintiff proceeds on a "material support" theory, however, the actions that are alleged to count as material support under section 2339A must *also* satisfy the requirements of Section 2331(1) in order to qualify as an act of "international terrorism" under that provision. *Gonzalez v. Google LLC*, 2 F.4th 871, 899 (9th Cir. 2021), *vacated on other grounds*, 598 U.S. 617 (2023). In other words, the actions alleged to constitute "material support for terrorism" under 18 U.S.C. § 2339A must also qualify as acts that are violent or dangerous to human life, undertaken with apparent intent to

coerce a civilian population or government, under 18 U.S.C. § 2331(1).  *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (even when an act qualifies as material support, "to qualify as international terrorism, a defendant's act must also involve violence or endanger human life"); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 699 (7th Cir. 2008).  Here, Plaintiff asserts that the same alleged INTERPOL actions described above constitute material support for Egypt's alleged terrorist acts.  INTERPOL's alleged actions cannot as a matter of law be characterized as violent or dangerous to human life, undertaken with the apparent intent to coerce a civilian population or government, for the reasons stated above.

## IV.   CONCLUSION

For the foregoing reasons, INTERPOL respectfully requests the Court dismiss Plaintiff's claims against INTERPOL.  Because the Complaint's existing allegations establish as a matter of law that INTERPOL is immune from suit and not subject to personal jurisdiction, and that Plaintiff has failed to state claims against INTERPOL, amendment would be futile and INTERPOL respectfully requests dismissal with prejudice.  *See Robinson v. Pilgram*, No. CV 20-2965 (GMH), 2021 WL 5987016, at *18 n.18 (D.D.C. Dec. 17, 2021) (where claims fail as a matter of law, amendment would be futile).

DATED: December 18, 2023        Respectfully submitted,

MUNGER, TOLLES & OLSON LLP


*/s/ Ginger D. Anders*

Ginger D. Anders (D.C. Bar No. 494471)
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW,
Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
Ginger.Anders@mto.com

Robert E. Bowen (pro hac vice pending)
Munger, Tolles & Olson LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Robert.Bowen@mto.com

*Counsel for the International Criminal Police
Organization (INTERPOL)*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Civil Rule 5.3, I hereby certify that on December 18, 2023, a true and correct copy of the foregoing was electronically filed with the Clerk of Court via the CM/ECF system, which served copies on all counsel of record in the case.

DATED: December 18, 2023                    Respectfully submitted,


                                            */s/ Ginger D. Anders*
                                            Ginger D. Anders